## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| James Smith, Robert Slover, Doug Hanson, Marissa Little, Krista Newble, Valerie Connelly, Michael Strong, Chris Moebus, Shane Kessinger, Justin Small, Stephen Young, Andrew Fay, Emily Couch, Bryan Sweeney, Sarah Janke, Kelli Byrnes, Dirk Homan, Daniel McCarthy, Rob Nestore, Guy Smith, Greg T. Vallejos, Johnathan Bullard, Steven Conti, Diane Kuczkowski, Kristy Marshall, Jeremy Peck, Kenneth Sutton, Sr., Peter Thompson, Jan Byrd, Kacy Garner, Morris Leondar, and Gregory D. Wiltshire<br><br>                    Plaintiffs<br>v.<br><br>General Motors Company, LLC<br><br>                    Defendant | Civil Action No.<br><br>Hon. |

## **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................1

II.   JURISDICTION ..................................................................................4

III.  VENUE ..............................................................................................5

IV.   PARTIES ............................................................................................5

    A.    Plaintiffs ...................................................................................5

        1.    Alabama Plaintiff(s)......................................................5

        2.    Arizona Plaintiff(s) .......................................................6

        3.    California Plaintiffs.......................................................8

        4.    Colorado Plaintiff.......................................................11

        5.    Connecticut Plaintiff ...................................................12

        6.    Florida Plaintiff...........................................................13

        7.    Illinois Plaintiff(s).......................................................14

        8.    Indiana Plaintiff...........................................................16

        9.    Kansas Plaintiff ...........................................................17

        10.   Louisiana Plaintiff(s) ...................................................18

        11.   Massachusetts Plaintiff(s) ...........................................19

        12.   Michigan Plaintiff .......................................................20

        13.   Minnesota Plaintiff(s) ..................................................21

        14.   Missouri Plaintiff ........................................................22

        15.   New Jersey Plaintiff .....................................................22

        16.   New Mexico Plaintiff...................................................26

|  | 17. | North Carolina Plaintiff .................................................26 |
|  | 18. | Ohio Plaintiff.................................................................28 |
|  | 19. | Pennsylvania Plaintiffs..................................................31 |
|  | 20. | Tennessee Plaintiff ........................................................34 |
|  | 21. | Texas Plaintiffs .............................................................35 |
|  | 22. | Virginia Plaintiff ..........................................................37 |
| B. | Defendant ................................................................................38 |
|  | 1. | General Motors Company, LLC ...................................38 |

V. FACTUAL ALLEGATIONS ................................................................39

    A. The GM Vehicles .....................................................................39

    B. The Defective Dashboard Cracks.............................................40

    C. The Defective Dashboard is a Safety Risk...............................43

    D. GM Has Had Knowledge of the Defective Dashboard.......................47

    E. Replacement of the Defective Dashboard................................54

VI. TOLLING OF THE STATUTE OF LIMITATIONS ..................................55

    A. Discovery Rule Tolling .............................................................55

    B. Fraudulent Concealment Tolling...........................................57

    C. Estoppel ...................................................................................58

VII. CLASS ALLEGATIONS .....................................................................58

VIII. CLAIMS ..........................................................................................71

    A. Claims Brought on Behalf of the Nationwide Class ...........................71

    B. Claims Brought on Behalf of the Alabama Subclass.........................82

    C. Claims Brought on Behalf of the Arizona Subclass ..........................90

D.  Claims Brought on Behalf of the California Subclass ........................94

E.  Claims Brought on Behalf of the Colorado Subclass .......................105

F.  Claims Brought on Behalf of the Connecticut Subclass ...................109

G.  Claims Brought on Behalf of the Florida Subclass...........................114

H.  Claims Brought on Behalf of the Illinois Subclass ..........................118

I.  Claims Brought on Behalf of the Indiana Subclass ..........................123

J.  Claims Brought on Behalf of the Kansas Subclass...........................131

K.  Claims Brought on Behalf of the Louisiana Subclass.......................139

L.  Claims Brought on Behalf of the Massachusetts Subclass ...............146

M.  Claims Brought on Behalf of the Michigan Subclass .......................150

N.  Claims Brought on Behalf of the Minnesota Subclass .....................158

O.  Claims Brought on Behalf of the Missouri Subclass ........................165

P.  Claims Brought on Behalf of the New Jersey Subclass....................169

Q.  Claims Brought on Behalf of the New Mexico Subclass.................173

R.  Claims Brought on Behalf of the North Carolina Subclass ..............181

S.  Claims Brought on Behalf of the Ohio Subclass ..............................188

T.  Claims Brought on Behalf of the Pennsylvania Subclass.................196

U.  Claims Brought on Behalf of the Tennessee Subclass......................200

V.  Claims Brought on Behalf of the Texas Subclass.............................206

W.  Claims Brought on Behalf of the Virginia Subclass ........................211

IX.  PRAYER FOR RELIEF ............................................................................216

X.  DEMAND FOR JURY TRIAL ..................................................................217

Plaintiffs James Smith, Robert Slover, Doug Hanson, Marissa Little, Krista Newble, Valerie Connelly, Michael Strong, Chris Moebus, Shane Kessinger, Justin Small, Stephen Young, Andrew Fay, Emily Couch, Bryan Sweeney, Sarah Janke, Kelli Byrnes, Dirk Homan, Daniel McCarthy, Rob Nestore, Guy Smith, Greg T. Vallejos, Johnathan Bullard, Steven Conti, Diane Kuczkowski, Kristy Marshall, Jeremy Peck, Kenneth Sutton, Sr., Peter Thompson, Jan Byrd, Kacy Garner, Morris Leondar, and Gregory D. Wiltshire, individually and on behalf of all others similarly situated (the "Class"), allege against Defendant General Motors Company LLC ("GM" or "Defendant"), upon personal knowledge as to themselves and their own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## I.    INTRODUCTION

1.    This case concerns GM's campaign to foist vehicles with single panel dash board installations which are inherently defective, prone to crack, and create an unreasonable safety hazard ("Defective Dashboards")[1] on consumers throughout the United States.  Consumers have paid GM more than a billion dollars for GM's

---

[1]   "Defective Dashboards" are the GM "instrument panel" part numbers series 1933133 and 232247, including but limited to 19331331, 19331340, 23224747, 23224748, and 23224749 installed in GM's GMT900 truck platform model years 2007-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series (collectively, the "GM Vehicles"). Upon information and belief, variation within each part number series (e.g., 23224747 and 23224748) pertains to non-material aspects of the dashboard such as the color.

- 1 -

GMT900 truck platform series vehicles which it touts as "dependable, longest-lasting," constructed with "premium precise attention to detail and craftsmanship." GM's representations were lies.

2.     All GM Vehicles have Defective Dashboards that are designed, manufactured, and/or installed in such a way that they will crack.

3.     The cracks occur in GM Vehicles stored in all environments and in substantially uniform locations and presentations on the instrument panel. GM knew all this when it marketed and sold the GM Vehicles.  To this day, GM is engaged in a systematic campaign to conceal the Defective Dashboards and the related safety risks—falsely representing to customers that the cracks are merely cosmetic.

4.     When Plaintiffs and the other Class members purchased or leased the GM Vehicles they did not know that the GM Vehicles contained Defective Dashboards that were manufactured, designed, and/or installed in a manner that causes them to crack.

5.     Indeed, it comes as no surprise that GM has hidden the Defective Dashboard from the public as the sale of GM Vehicles has fueled its post-bankruptcy success.

6.     Consumers are buying more GM Vehicles, pushing GM's 2017 first-quarter net income to a record $2.6 billion.  By way of example, U.S. sales of one of

the GM Vehicles, the Chevrolet Tahoe, rose nearly 15 percent in the first-quarter of 2017 to almost 54,000 vehicles.

7.     Kelley Blue Book reports that the average Tahoe, a GM Vehicle, sells for more than $58,000.   Other versions with leather seating, sunroof and advanced safety electronics, sell for more than $65,000. GM's average vehicle sale price is over $34,000, a full $3,000 above industry standard. Wall Street analysts report that GM makes $10,000 or more on each GM Vehicle.

8.     The Defective Dashboards reduce the GM Vehicles' value and compromise the safe deployment of the airbags.

9.     Because GM has not remedied the defects in the dashboards installed on the GM Vehicles, a customer who replaces a Defective Dashboard would simply receive another Defective Dashboard.  The cost to replace the Defective Dashboard with another Defective Dashboard, including parts and labor, can exceed $2000 for Plaintiffs and class members.  Worse still, GM has failed and refused to cover the necessary repair and replacement under its warranty.

10.     As a result of GM's practices, Plaintiffs and the other Class members have suffered injury in fact and have lost money or property, including economic damages.

11.     Moreover, GM has committed unfair and/or deceptive acts and practices under the laws of Alabama, Arizona, California, Colorado, Connecticut,

Florida, Illinois, Indiana, Kansas, Louisiana, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New Mexico, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, and Virginia; unjustly enriched itself at the expense of consumers in Alabama, Arizona, California, Colorado, Connecticut, Florida, Illinois, Indiana, Kansas, Louisiana, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New Mexico, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, and Virginia; and violated the Magnuson-Moss Federal Warranty Act, 15 U.S.C. § 2301, *et seq.*

12.    This lawsuit seeks restitution and compensation for the customers that GM has bilked.

## II.    JURISDICTION

13.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because at least one class member is of diverse citizenship from one defendant, there are more than 100 class members nationwide, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of costs and interest.

14.    The Court has personal jurisdiction over GM because GM has purposefully availed itself of the privilege of conducting business activities in the State of Michigan. Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because GM's corporate headquarters is located in Detroit, MI, a substantial part of the acts or omissions giving rise to the claims brought herein occurred or emanated

within this District, and GM has caused harm to one or more Plaintiffs residing in this District.

### III.   VENUE

15.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, where GM was headquartered for the relevant time period. Moreover, GM has marketed, advertised, sold, and leased the GM Vehicles within this District.

### IV.   PARTIES

**A.    Plaintiffs**

**1.    Alabama Plaintiff(s)**

16.    Plaintiff James Smith is a citizen of Northport, Alabama.  James Smith owns a 2012 Chevrolet Silverado 1500 LTZ, which was purchased used in or about March 2013 for approximately $37,000 from Barkley GMC, in Tuscaloosa, Alabama. James Smith's 2012 Chevrolet Silverado 1500 LTZ was covered by a written warranty.  Prior to purchasing the vehicle, James Smith viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Barkley GMC emphasized the quality, durability, and safety features of the vehicle.  On or about July 2017, Plaintiff James Smith noticed a crack to the left of the instrument cluster.  On or about September 2017, Plaintiff

James Smith noticed a crack near the passenger side airbag.   At the time that James Smith first noticed cracks, the vehicle had approximately 90,000 miles.  On or about September 2017, Plaintiff James Smith contacted GM through its Facebook page and communicated with GM's customer service through private messenger at GM's request.   GM referred Plaintiff James Smith to Tuscaloosa Chevrolet for an inspection of the vehicle.  On or about, October 12, 2017, Tuscaloosa Chevrolet told Plaintiff that he would have to pay the full amount, approximately $1,000, to fix the dashboard.  The value of James Smith's vehicle has been diminished as a result of the Dashboard Defect. James Smith would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

### 2.    Arizona Plaintiff(s)

17.    Plaintiff Robert Slover is a citizen of Window Rock, Arizona.  Mr. Slover owns a 2009 Chevrolet Avalanche LTZ,[2] which was purchased used in or about mid-September 2017 for approximately $17,000 from Flower Motors, Montrose, Colorado.  Prior to purchasing the vehicle, Mr. Slover viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Flower Motors emphasized the quality, durability, and safety

---

[2] According to the sticker on the inside of the vehicle, the manufacturer's date for Mr. Slover's vehicle was August 2009.

features of the vehicle.  On or about late-September 2017, Plaintiff Slover noticed a crack near the passenger side airbag.   At the time that Mr. Slover first noticed the crack the vehicle had approximately 156,000 miles.  In or about October 2017, Plaintiff Slover contacted GM through its Facebook page and, at its request, communicated through private messenger with GM customer service.  GM referred Plaintiff Slover to Amigo Chevrolet in Gallup, New Mexico to schedule an inspection of the vehicle.  The Amigo Chevrolet customer service advocate, who identified herself as Christal, told Plaintiff Slover that the cracked dashboard was an "ongoing problem" and that GM would "not allow for a replacement free of charge."  Thus, Plaintiff would have to pay the full cost of the replacement to fix the dashboard. Moreover, Plaintiff Slover's 2009 Chevrolet Avalanche LTZ is subject to the Takata airbag recall and the dealership has subsequently refused to perform the recall countermeasure unless Plaintiff Slover pays $1,400 to replace the dashboard.  The value of Mr. Slover's vehicle has been diminished as a result of the Dashboard Defect.  Mr. Slover would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

### 3.     California Plaintiffs

18.     Plaintiff Doug Hanson is a citizen of Camarillo, California.  Plaintiff owns a 2011 GMC Yukon Denali Hybrid, which was purchased used in or about 2016 for approximately $31,000 from Mercedes-Benz of Calabasas in Calabasas, California.   Mr. Hanson's 2011 GMC Yukon Denali Hybrid was covered by a written warranty. Prior to purchasing the vehicle, Mr. Hanson viewed and heard commercials that touted GM's long record of durability and safety.  On or about November 9, 2017, Mr. Hanson noticed a crack to the left of the instrument cluster. At the time that Mr. Hanson first noticed the crack the vehicle had approximately 72,000 miles.   On or about November 15, 2017, Mr. Hanson contacted GM to inquire about scheduling a repair or replacement and was told to contact Silverstar Buick GMC in Westlake Village, California.  GM would not replace or repair the Dashboard Defect, so Mr. Hanson attempted to repair it with silicon glue.  On or about December 18, 2017, Mr. Hanson noticed another crack to the left of the instrument cluster.  The value of Mr. Hanson's vehicle has been diminished as a result of the Dashboard Defect.  Mr. Hanson would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

19.    Plaintiff Marissa Little is a citizen of La Verne, California.  Ms. Little owns a 2011 GMC Denali XL, which was purchased used in or about 2015 for approximately $31,000.  Ms. Little's GMC Denali XL was covered by a written warranty. Ms. Little also purchased an extended warranty.  Prior to purchasing the vehicle, Ms. Little viewed and heard commercials that touted GM's long record of durability and safety. In or about June 2015, Plaintiff Little noticed a crack near the passenger side airbag.  At the time that Ms. Little first noticed the crack, the vehicle had approximately 71,000 miles. In or about July 2015, Plaintiff Little contacted Reynolds Buick GMC in Covina, California to inquire about scheduling a repair or replacement and was told that it was not covered under warranty, and would cost over $1,000 to replace.  The value of Ms. Little's vehicle has been diminished as a result of the Dashboard Defect.  Ms. Little would not have purchased the vehicle or would not have paid as much for it had she known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

20.    Plaintiff Krista Newble is a citizen of Lancaster, California.  Ms. Newble owns a 2013 Chevrolet Avalanche, which was purchased new in or about 2013 for approximately $48,389 from Antelope Valley Chevrolet in Lancaster, California.  Ms. Newble's 2013 Chevrolet Avalanche was covered by a written warranty.  Ms. Newble also purchased and extended warranty for $2,995. Prior to

purchasing the vehicle, Ms. Newble viewed and heard commercials that touted GM's long record of durability and safety and the sales representative at Antelope Valley Chevrolet emphasized the quality, durability and safety features of the vehicle.  On or about August 13, 2017, Plaintiff Newble noticed cracks to the left of the instrument cluster and near the passenger side air-bag.  At the time that Ms. Newble first noticed the cracks the vehicle had approximately 82,000 miles.  On or about September 27, 2017, Plaintiff Newble contacted Antelope Valley Chevrolet to inquire about scheduling a repair or replacement and was told that the vehicle warranty, which was still in effect, did not cover the repair or replacement.  Likewise, a claim under extended warranty was declined.  On September 28, 2017, Plaintiff Newble contacted GM's customer engagement center and spoke to a representative who confirmed that her vehicle was out of warranty.  On October 3, 2017, Plaintiff Newble spoke to a manager in GM's customer engagement center, who identified herself as Amanda, who told her that GM would pay $300 towards the cost of replacement, leaving Plaintiff responsible for the $732.00 balance.   The value of Ms. Newble's vehicle has been diminished as a result of the Dashboard Defect. Ms. Newble would not have purchased the vehicle or would not have paid as much for it had she known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

- 10 -

### 4.    Colorado Plaintiff

21.    Plaintiff Valerie Connelly is a citizen of Silverthorne, Colorado.  Ms. Connelly owns a 2010 Chevrolet Tahoe LTZ, which was purchased used in or about 2016 for approximately $28,900 from Land Rover Roaring Fork in Glenwood Springs, Colorado.  Prior to purchasing the vehicle, Ms. Connelly viewed and heard commercials that touted GM's long record of durability and safety. On or about November of 2016, Plaintiff Connelly noticed a crack near the passenger side airbag.   At the time that Ms. Connelly noticed the crack, the vehicle had approximately 100,000 miles.  In or about August 2017, Plaintiff Connelly noticed a crack to the left of the instrument cluster.  In or about November 2017, Plaintiff Connelly contacted Hudson Auto Source in Silverthorne, Colorado to inquire about scheduling a repair or replacement and was told they "are aware of the issue" and "can repair or replace the dashboard for the regular rate."  No warranty options or discounts were available for the service.  The value of Ms. Connelly's vehicle has been diminished as a result of the Dashboard Defect. Ms. Connelly would not have purchased the vehicle or would not have paid as much for it had she known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

### 5.    Connecticut Plaintiff

22.    Plaintiff Michael Strong is a citizen of Wethersfield, Connecticut.  Mr. Strong owns a 2010 Chevrolet Avalanche LTZ, which was purchased new in or about 2010 for approximately $61,115 from Richard Chevrolet in Cheshire, Connecticut.  Mr. Strong's 2010 Chevrolet Avalanche LTZ was covered by a 36 months/36,000 miles bumper to bumper written warranty and a 5 year/100,000 miles Powertrain written warranty. Mr. Strong also purchased an extended warranty for $1,465 for "Major Guard Coverage" which extended the warranty to 60 months/75,000 miles.   On February 26, 2015, Mr. Strong purchased "Pinnacle Coverage," a National Auto Care Extended Warranty, from Richard Chevrolet for $2,556.65.  This extended warranty will expire on February 26, 2019, or when the vehicle reaches 106,112 miles.  Prior to purchasing the vehicle, Mr. Strong viewed and heard commercials that touted GM's long record of durability and safety.  In or about the summer of 2017, Plaintiff Strong noticed a crack on the passenger side airbag.   At the time that Mr. Strong first noticed the crack the vehicle had approximately 73,000 miles.   On or about September 1, 2017, Plaintiff Strong contacted Richard Chevrolet to inquire about scheduling a repair or replacement and was told that it would not be covered under Mr. Strong's extended warranty. Service Writer Sidney Greatorex told Mr. Strong that it would cost approximately $1,850 to replace the dashboard.  Approximately one month later, Plaintiff Strong

again contacted Richard Chevrolet about the crack, and Service Director Jamie Gray contacted the Dealer Representative to discuss the issue.  GM agreed to share the repair cost with Mr. Strong, and the dashboard was replaced on or about October 13, 2017.  Mr. Strong paid approximately $650 for the replacement but the dashboard was replaced with the same, defective part.  The value of Mr. Strong's vehicle has been diminished as a result of the Dashboard Defect.  Mr. Strong would not have purchased the vehicle or would not have paid as much for it had she known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

### 6.    Florida Plaintiff

23.    Plaintiff Chris Moebus is a citizen of Gainesville, Florida.  Mr. Moebus owns a 2011 Chevrolet Silverado LT Extended Cab, which was purchased new in or about 2011 for approximately $32,895 from Lou Bachrodt Chevrolet in Boca Raton, Florida.  Mr. Moebus's 2011 Chevrolet Silverado LT Extended Cab was covered by a written warranty.  Prior to purchasing the vehicle, Mr. Moebus viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Lou Bachrodt Chevrolet emphasized the quality, durability, and safety features of the vehicle. On or about 2014, Plaintiff Moebus noticed cracks to the left of the instrument cluster and near the passenger

side airbag.    At the time that Mr. Moebus first noticed cracks, the vehicle had approximately 40,000 miles.    Shortly after noticing the cracks, Plaintiff Moebus asked Sawgrass Chevrolet about repairing or replacing the Defective Dashboard when he brought the vehicle in for a scheduled maintenance.    A service representative from Sawgrass Chevrolet told Plaintiff Moebus that the vehicle was out of warranty and Plaintiff would have to pay approximately $2,000 to fix the dashboard.    The value of Mr. Moebus's vehicle has been diminished as a result of the Dashboard Defect.    Mr. Moebus would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

### 7.    Illinois Plaintiff(s)

24.    Plaintiff Shane Kessinger is a citizen of Worden, Illinois.  Mr. Kessinger owns a 2010 Yukon Denali XL, which was purchased used in or about November 2015 for approximately $38,000 from Monken Nissan GMC in Centralia, Illinois.  At the time of purchase, the 2010 Yukon Denali XL had approximately 37,000 miles.  Prior to purchasing the vehicle, Mr. Kessinger viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Monken Nissan GMC emphasized the quality, durability, and safety features of the vehicle.  In fact, Mr. Kessinger specifically asked the

Monken Nissan GMC sales representative if the Denali's dashboard was going to crack, because Mr. Kessinger previously had a 2008 Chevrolet Avalanche with a cracked dashboard and he did not want to purchase another GM vehicle with the Dashboard Defect. The sales representative assured Mr. Kessinger that they have "not seen the problem" on the Denalis. In or about June 2017, Plaintiff Kessinger noticed a crack near the passenger side airbag. At the time that Mr. Kessinger first noticed the crack the vehicle had approximately 58,000 miles. As soon as he noticed the crack, in June 2017, Plaintiff Kessinger contacted GM customer service by telephone to inquire about scheduling a repair or replacement and GM referred him to a local dealership, Steve Schmidt Chevrolet GMC, in Highland Park, Illinois for an evaluation. After evaluating the crack, the representative from Steve Schmidt told Mr. Kessinger that GM would not cover any of the cost for a replacement because the vehicle was out of warranty. Plaintiff would have to pay the full cost of $1,000 to fix the dashboard. The value of Mr. Kessinger's vehicle has been diminished as a result of the Dashboard Defect. Mr. Kessinger would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

### 8.    Indiana Plaintiff

25.    Plaintiff Justin Small is a citizen of North Salem, Indiana.  Mr. Small owns a 2011 GMC Denali, which was purchased used in or about 2016 for approximately $35,000 from Christi Hubler Chevrolet in Crawfordsville, Indiana. Prior to purchasing the vehicle, Mr. Small viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Christi Hubler Chevrolet emphasized the quality, durability, and safety features of the vehicle. In or about June 2017, Plaintiff Small noticed a crack to the left of the instrument cluster.  At the time that Mr. Small first noticed a crack, the vehicle had approximately 75,000 miles. In or about August 2017, Plaintiff Small contacted Christi Hubler Chevrolet to inquire about scheduling a repair or replacement and was told the repair or replacement was not covered under a warranty, and it would cost him approximately $600 to replace the dashboard. The value of Mr. Small's vehicle has been diminished as a result of the Dashboard Defect. Mr. Small would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

26.    Plaintiff Stephen Young is a citizen of Fillmore, Indiana.  Mr. Young owns a 2011 GMC Sierra Z71 Crew Cab, which was purchased used in or about 2016 for approximately $25,000 from Hobson Chevrolet in Martinsville, Indiana.

Prior to purchasing the vehicle, Mr. Young viewed and heard commercials that touted GM's long record of durability and safety features.  On or about September 2017, Plaintiff Young noticed a crack near the passenger side airbag.  At the time that Mr. Young first noticed the crack the vehicle had approximately 80,000 miles. The value of Mr. Young's vehicle has been diminished as a result of the Dashboard Defect.   Mr. Young would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

### 9.   Kansas Plaintiff

27.    Plaintiff Andrew Fay is a citizen of Wichita, Kansas.  Mr. Fay owns a 2012 GMC Sierra SLE Z71, which was purchased used in or about 2014 for approximately $30,000 from Subaru of Wichita in Wichita, Kansas.  Mr. Fay's 2012 GMC Sierra SLE Z71 was covered by a written warranty.  Prior to purchasing the vehicle, Mr. Fay viewed and heard commercials that touted GM's long record of durability and safety. In or about April 2017, Mr. Fay noticed a crack near the passenger side airbag. Then, in or about July 2017, Plaintiff Fay noticed a crack to the left of the instrument cluster.  At the time that Mr. Fay first noticed the crack, the vehicle had approximately 38,000 miles. On or about July 14, 2017, Plaintiff Fay contacted GM by telephone to inquire about scheduling a repair or replacement,

and was referred to Hatchett GMC Service in Wichita, Kansas that offered to repair the dashboard for approximately $500. Hatchett GMC Service told Mr. Fay that if he repaired the dash, it would likely crack again in the future because the replacement dashboards were made the same way. The value of Mr. Fay's vehicle has been diminished as a result of the Dashboard Defect. Mr. Fay would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

### 10.   Louisiana Plaintiff(s)

28.    Plaintiff Emily Couch is a citizen of Donaldsville, Louisiana. Ms. Couch owned a 2014 Chevrolet Tahoe, which was purchased new in or about January 2014 for approximately $50,000 from Gerry Lane Chevrolet in Baton Rouge, Louisiana. Ms. Couch's 2014 Chevrolet Tahoe was covered by a written warranty. Prior to purchasing the vehicle, Ms. Couch viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Gerry Lane Chevrolet emphasized the quality, durability, and safety features of the vehicle. In or about December 2016, Plaintiff Couch noticed a crack near the passenger side airbag. In or about October 2017, Plaintiff noticed a second crack to the left of the instrument cluster. At the time that Ms. Couch first noticed the crack, the vehicle had approximately 50,000 miles. On or about January

2017, Plaintiff Couch contacted GM's customer service by telephone and was directed to call the dealership about scheduling a repair or replacement.  Ultimately, GM offered to pay a portion of the cost of the replacement dashboard, but Plaintiff would be responsible to pay $700 herself.  After the second crack appeared in October 2017, Plaintiff decided to trade in her vehicle for a different car.  The value of Ms. Couch's vehicle was been diminished as a result of the Dashboard Defect. Ms. Couch would not have purchased the vehicle or would not have paid as much for it had she known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

### 11.   Massachusetts Plaintiff(s)

29.    Plaintiff Bryan Sweeney resides in Dennis, Massachusetts.  Mr. Sweeney owns a 2010 Yukon Denali, which was purchased certified preowned in or about May 2017 for approximately $26,000 from McGee Chevrolet in Raynham, Massachusetts. At the time of purchase, the vehicle had approximately 84,000 miles.   Mr. Sweeney's 2010 Yukon Denali was covered by a written warranty.  Prior to purchasing the vehicle, Mr. Sweeney viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at McGee Chevrolet emphasized the quality, durability, and safety features of the vehicle.  In or about July 2017, Plaintiff Sweeney noticed a crack to

the left of the instrument panel.  At the time that Mr. Sweeney first noticed the crack, the vehicle had approximately 86,000 miles.  On or about June 10, 2017, Plaintiff Sweeney contacted McGee Chevrolet to inquire about scheduling a repair or replacement and was told that the warranty did not cover the defect.  The value of Mr. Sweeney's vehicle has been diminished as a result of the Dashboard Defect.  Mr. Sweeney would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver-side and passenger-side airbags.

### 12.    Michigan Plaintiff

30.    Plaintiff Sarah Janke is a citizen of Holland, Michigan.  Ms. Janke owns a 2011 Yukon SLT, which was purchased used in or about July 2016 for approximately $24,500 in a private sale.  At the time of purchase, the vehicle had approximately 44,000 miles.  Prior to purchasing the vehicle, Ms. Janke viewed and heard commercials that touted GM's long record of durability and safety.  On or about October 2017, Plaintiff Sarah Janke noticed a crack near the passenger side airbag.   At the time that Ms. Janke first noticed the crack, the vehicle had approximately 95,000 miles.  The value of Ms. Janke's vehicle has been diminished as a result of the Dashboard Defect. Ms. Janke would not have purchased the vehicle or would not have paid as much for it had she known of the Defective

Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

### 13.   Minnesota Plaintiff(s)

31.     Plaintiff Kelli Byrnes is a citizen of Pipestone, Minnesota.  Ms. Byrnes owns a 2011 Chevrolet Silverado LT, which was purchased used in or about April 2017 for approximately $26,349 from Billion Chevrolet, in Sioux Falls, South Dakota.  Ms. Byrnes' 2011 Chevrolet Silverado LT was covered by an extended warranty, which Plaintiff purchased for $2,407.  Prior to purchasing the vehicle, Ms. Byrnes viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Billion Chevrolet emphasized the quality, durability, and safety features of the vehicle.  On or about June 1, 2017, Plaintiff Byrnes noticed a crack near the passenger side airbag.  A second crack near the instrument cluster appeared shortly thereafter.  At the time that Ms. Byrnes first noticed cracks the vehicle had approximately 81,000 miles.  On or about June 5, 2017, Plaintiff Byrnes contacted GM by telephone to inquire about scheduling a repair or replacement and was told the vehicle was out of warranty and Plaintiff would have to pay to fix the dashboard.  GM also referred Plaintiff to Billion Chevrolet.  Plaintiff was told by Billion Chevrolet that the defect was not covered under the extended warranty.  The value of Ms. Byrnes' vehicle has been diminished as a result of the Dashboard Defect.  Ms. Byrnes would not have

purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

### 14.   Missouri Plaintiff

Plaintiff Dirk Homan is a citizen of Peoria, Illinois.  Mr. Homan owns a 2013 GMC Yukon Denali, which was purchased used in or about 2017 for approximately $25,000 from Willard Motor Company in Springfield, Missouri. Prior to purchasing the vehicle, Mr. Homan viewed and heard commercials that touted GM's long record of durability and safety features.  On or about November 3, 2017, Plaintiff Homan noticed cracks to the left of the instrument cluster and near the passenger side airbag.  At the time that Mr. Homan first noticed cracks the vehicle had approximately 111,000 miles.  The value of Mr. Homan's vehicle has been diminished as a result of the Dashboard Defect.  Mr. Homan would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

### 15.   New Jersey Plaintiffs

32.   Plaintiff Daniel McCarthy is a citizen of Lake Hopatcong, New Jersey. Mr. McCarthy owns a 2011 Chevrolet Silverado LT, which was purchased new in or about 2011 for approximately $38,000 from Gearhart Chevrolet (now

Schumacher Chevrolet) in Denville, New Jersey.  Mr. McCarthy's 2011 Chevrolet Silverado LT was covered by a written warranty.  Prior to purchasing the vehicle, Mr. McCarthy viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Gearhart Chevrolet emphasized the quality, durability, and safety features of the vehicle. In or about August 2017, Mr. McCarthy noticed a crack near the passenger side airbag.  At the time that Mr. McCarthy first noticed the crack, the vehicle had approximately 100,000 miles. In or about August 2017, Plaintiff McCarthy contacted Schumacher Chevrolet of Dover, New Jersey, to inquire about scheduling a repair or replacement and the service representative took photographs and told him that he would review the procedure to fix the problem.  Mr. McCarthy was then told the service manager needed to see the problem, and more photographs were taken at Schumacher Chevrolet. The Schumacher Chevrolet service manager referred the issue to GM. Mr. McCarthy's GM case number is 8-3428086506.  Mr. McCarthy spoke with a senior service advisor at GM multiple times and was told that GM would not repair the problem despite Mr. McCarthy's safety concerns. GM eventually agreed to share the cost of replacing the dashboard, but Mr. McCarthy would have to pay $350.  The value of Mr. McCarthy's vehicle has been diminished as a result of the Dashboard Defect.  Mr. McCarthy would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity

- 23 -

to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

33.     Plaintiff Rob Nestore is a citizen of Marlton, New Jersey.  Mr. Nestore owns a 2012 GMC Yukon, which was purchased new in or about 2012 for approximately $65,000 from Burns Buick GMC in Marlton, New Jersey. Mr. Nestore's 2012 GMC Yukon was covered by a written warranty. Prior to purchasing the vehicle, Mr. Nestore viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Burns Buick GMC emphasized the quality, durability, and safety features of the vehicle. At the time that Mr. Nestore first noticed a crack, the vehicle had approximately 40,000 miles.  On or about November of 2015, Plaintiff Nestore contacted Burns Buick GMC to inquire about scheduling a repair or replacement and was told it would cost approximately $300 to fix the cracked dashboard.  Subsequently, the dashboard was replaced on or about November of 2015.  Mr. Nestore noticed a crack on the replacement dashboard to the left of the instrument cluster.  At the time that Mr. Nestore first noticed a crack on the replacement dashboard the vehicle had approximately 58,000 miles.   On or about November of 2017, Mr. Nestore contacted Burns Buick GMC to inquire about scheduling a repair or replacement and was told it would cost approximately $800 to fix the cracked dashboard.  The value of Mr. Nestore's vehicle has been diminished as a result of the Dashboard

Defect.  Mr. Nestore would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

34.    Plaintiff Guy Smith is a citizen of Mays Landing, New Jersey.  Guy Smith owns a 2011 Chevrolet Tahoe LTZ, which was purchased certified pre-owned in or about 2015 for approximately $40,000 from Chevrolet of Turnersville in Turnersville, New Jersey.  Prior to purchasing the vehicle, Guy Smith viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Chevrolet of Turnersville emphasized the quality, durability, and safety features of the vehicle.  On or about July of 2017, Plaintiff Guy Smith noticed a crack to the left of the instrument cluster.   At the time that Guy Smith first noticed the crack, the vehicle had approximately 120,000 miles.  The value of Guy Smith's vehicle has been diminished as a result of the Dashboard Defect. Guy Smith would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

### 16.    New Mexico Plaintiff

35.    Plaintiff Greg T. Vallejos is a citizen of Dexter, New Mexico.  Mr. Vallejos owns a 2012 Chevrolet Silverado LT, which was purchased used in or about October 2016 for $32,000 from Tate Branch, in Artesia, New Mexico.  Mr. Vallejos' 2012 Chevrolet Silverado LT was covered by a full lifetime power train warranty.   Prior to purchasing the vehicle, Mr. Vallejos viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Tate Branch emphasized the quality, durability, and safety features of the vehicle.  On or about December 2016, Plaintiff Vallejos noticed a crack near the passenger side airbag and later noticed a second crack to the left of the instrument cluster.  At the time that Mr. Vallejos first noticed the crack, the vehicle had approximately 48,000 miles.  The value of Mr. Vallejos' vehicle has been diminished as a result of the Dashboard Defect.  Mr. Vallejos would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

### 17.    North Carolina Plaintiff

36.    Plaintiff Johnathon Bullard is a citizen of Four Oaks, North Carolina. Mr. Bullard owns a 2012 Chevrolet Silverado, which was purchased new in or about 2012 for $44,500 from Deacon Jones Chevrolet GMC in Smithfield, North

Carolina.  Mr. Bullard's 2012 Chevrolet Silverado was covered by a 3 year/36,000 mile bumper to bumper written warranty and a 5 year/100,000 mile power train written warranty.  Mr. Bullard also purchased an extended warranty for $1,800. Prior to purchasing the vehicle, Mr. Bullard viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Deacon Jones Chevrolet GMC emphasized the quality, durability, and safety features of the vehicle.  On or about June of 2016, Plaintiff Bullard noticed cracks to the left of the instrument cluster and on the passenger side airbag.  At the time that Mr. Bullard first noticed cracks the vehicle had approximately 110,000 miles. In or about September 2017, Plaintiff Bullard contacted GM and was told they had "no complaints about the dashboard."  GM told Plaintiff to contact the dealer, and there would be a charge for the replacement or repairs.  In or about October 2017, Plaintiff Bullard contacted Deacon Jones Chevrolet GMC to inquire about scheduling a repair or replacement and, unlike GM, was told it is "a very common problem with the truck," and it would cost approximately $1,500 to fix.  The value of Mr. Bullard's vehicle has been diminished as a result of the Dashboard Defect. Mr. Bullard would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

- 27 -

18.   **Ohio Plaintiff**

37.   Plaintiff Steven Conti is a citizen of South Russell, Ohio.  Mr. Conti owns a 2013 Chevrolet Tahoe LT which was purchased certified pre-owned in or about 2014 for approximately $36,900 from Huebner Chevrolet in Carrollton, Ohio. Mr. Conti's 2013 Chevrolet Tahoe LT was covered by a certified pre-owned bumper to bumper limited written warranty.  Mr. Conti also purchased an extended warranty for $1,956.  Prior to purchasing the vehicle, Mr. Conti viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Huebner Chevrolet emphasized the quality, durability, and safety features of the vehicle.  In or about August 2017, Plaintiff Conti noticed a crack near the passenger side airbag.  At the time that Mr. Conti first noticed the crack the vehicle had approximately 65,000 miles. Plaintiff Conti contacted Preston Chevrolet to inquire about scheduling a repair or replacement and was told the repairs would cost a minimum of $1,500, and Mr. Conti would be responsible for the entire bill.  In or about August 2017, Plaintiff Conti also contacted Huebner Chevrolet to inquire about scheduling a repair or replacement and was told the service department would not repair the dashboard or provide compensation for the repairs. Mr. Conti then contacted GM, and GM initiated a claim for the cracked dashboard.  GM claimed that Mr. Conti's vehicle was out of warranty and refused to repair or replace the cracked dashboard.  In or about October of 2017, Plaintiff

Conti contacted Pat O'Brien Chevrolet to inquire about scheduling a repair or replacement and was told the dash replacement would cost about $1,300. The value of Mr. Conti's vehicle has been diminished as a result of the Dashboard Defect. Mr. Conti would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

38.     Plaintiff Diane Kuczkowski is a citizen of Copley, Ohio.   Ms. Kuczkowski owns a 2011 Chevrolet Tahoe, which was purchased certified pre-owned in or about 2014 for approximately $33,900 from Sweeney Chevrolet in Youngstown, Ohio. Ms. Kuczkowski's 2011 Chevrolet Tahoe was covered by a written warranty.   Prior to purchasing the vehicle, Ms. Kuczkowski viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Sweeney Chevrolet emphasized the quality, durability, and safety features of the vehicle. In or about April 2017, Plaintiff Kuczkowski noticed cracks to the left of the instrument cluster and near the passenger side air-bag.  At the time that Ms. Kuczkowski first noticed cracks the vehicle had approximately 98,000 miles.   In or about October 2017, Plaintiff Kuczkowski contacted Van Devere Chevrolet to inquire about scheduling a repair or replacement and was told the vehicle was out of warranty, but the dealer could offer a warranty pricing

discount of $300 off the approximately $1,225 cost to replace the cracked dashboard.  The value of Ms. Kuczkowski's vehicle has been diminished as a result of the Dashboard Defect.  Ms. Kuczkowski would not have purchased the vehicle or would not have paid as much for it had she known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

39.    Plaintiff Kristy Marshall is a citizen of Bridgeport, West Virginia.  Ms. Marshall owns a 2011 GMC Yukon Denali XL, which was purchased certified pre-owned, in or about September 2012 for approximately $46,977 from Classic Buick GMC in Painesville, Ohio.  Ms. Marshall's 2011 GMC Yukon Denali XL was covered by a 6-year/100,000 mile powertrain warranty and a 12-month/12,000 mile bumper-to-bumper warranty.  Ms. Marshall also purchased an extended warranty for $2,500.  Prior to purchasing the vehicle, Ms. Marshall viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Classic Buick GMC emphasized the quality, durability, and safety features of the vehicle.  In or about July 2017, Plaintiff Marshall noticed a crack to the left of the instrument cluster.  At the time that Ms. Marshall first noticed the crack, the vehicle had approximately 76,000 miles.  In or about September 2017, Plaintiff Marshall contacted Astro Buick GMC in White Hall, West Virginia to inquire about scheduling a repair or replacement and was told that the dashboard

crack was cosmetic. GM disclaimed coverage under any of her warranties.  Astro Buick GMC informed Plaintiff Marshall that she would have to pay the full cost to fix the dashboard.  The value of Ms. Marshall's vehicle has been diminished as a result of the Dashboard Defect.  Ms. Marshall would not have purchased the vehicle or would not have paid as much for it had she known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

### 19.   Pennsylvania Plaintiffs

40.   Plaintiff Jeremy Peck is a citizen of State College, Pennsylvania.  Mr. Peck owns a 2010 Chevrolet Suburban, which was purchased used in or about 2016 for approximately $25,639 from Bill Macintyre Chevrolet Buick in Lock Haven, Pennsylvania. Mr. Peck's 2010 Chevrolet Suburban was covered by a written warranty. Mr. Peck also purchased an extended warranty for $2,095. Prior to purchasing the vehicle, Mr. Peck viewed and heard commercials that touted GM's long record of durability and safety.  On or about June 27, 2017, Plaintiff Peck noticed a crack to the left of the instrument cluster.  At the time that Mr. Peck first noticed a crack the vehicle had approximately 68,000 miles.  On or about June 27, 2017, Mr. Peck sent an email to the Chevrolet Customer Assistance Center at corporate@gm.com informing GM that his dashboard had just cracked.  He was assigned Service Request Number 8-3057386503, and later referred to a Customer

Experience Manager at Macintyre Chevrolet Buick who told Mr. Peck that he could bring the vehicle to the service department for evaluation.  The value of Mr. Peck's vehicle has been diminished as a result of the Dashboard Defect.  Mr. Peck would not have purchased the vehicle or would not have paid as much for it had he known of the problems or risk associated with the vehicle's Dashboard Defect.

41.    Plaintiff Kenneth Sutton, Sr., is a citizen of Palmerton, Pennsylvania. Mr. Sutton owns a 2013 GMC Denali 2500 Diesel, which was purchased certified pre-owned in or about 2015 for approximately $49,000 from Star Buick GMC Cadillac in Quakertown, Pennsylvania. Mr. Sutton's 2013 GMC Denali 2500 Diesel was covered by a written warranty. Mr. Sutton also purchased an extended warranty for approximately $2,000. Prior to purchasing the vehicle, Mr. Sutton viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Star Buick GMC Cadillac in Quakertown emphasized the quality, durability, safety features of the vehicle. In or about December 2015, Plaintiff Sutton noticed a crack near the passenger side airbag.  At the time that Mr. Sutton first noticed the crack, the vehicle had approximately 30,000 miles. In January 2016, Mr. Sutton spoke to a service representative at Star Buick GMC Cadillac about the crack near the passenger side airbag and was told that it was a trim issue and not covered under warranty.  In or about July 2017, Mr. Sutton noticed the crack to the left of the instrument panel.  At the time that Mr. Sutton

noticed the second crack, the vehicle had approximately 50,000 miles.  In or about October 2017, Plaintiff Sutton contacted Star Buick GMC Cadillac to inquire about scheduling a repair or replacement and was told that they "are aware of the issue." Star Buick GMC Cadillac offered to replace the dashboard for 20% off the $1,600 cost of the replacement. Mr. Sutton would be responsible for approximately $1,280 to replace the dashboard. The value of Mr. Sutton's vehicle has been diminished as a result of the Dashboard Defect. Mr. Sutton would not have purchased the vehicle or would not have paid as much for it had he known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

42.    Plaintiff Peter Thompson is a citizen of Oxford, Pennsylvania.  Mr. Thompson owns a 2011 Chevrolet Tahoe LTZ, which was purchased used in or about 2017 for approximately $29,000 from Jeff Dambrosio Chevrolet in Oxford, Pennsylvania.  Mr. Thompson's 2011 Chevrolet Tahoe LTZ was covered by a written warranty.  Mr. Thompson also purchased and extended warranty for $3,240. Prior to purchasing the vehicle, Mr. Thompson viewed and heard commercials that touted GM's long record of durability and safety.  In or about April 2017, Plaintiff Thompson noticed a crack to the left of the instrument cluster.  At the time that Mr. Thompson first noticed the crack the vehicle had approximately 100,000 miles.  On or about July 19, 2017, Plaintiff Thompson contacted Jeff Dambrosio Chevrolet to

inquire about scheduling a repair or replacement and was told that it was not covered by the extended warranty because it is a cosmetic defect, not a mechanical defect.  The service representative from the dealership informed Mr. Thompson that he would have to pay the full cost, over $1,000, for a replacement dashboard.  The value of Mr. Thompson's vehicle has been diminished as a result of the Dashboard Defect.  Mr. Thompson would not have purchased the vehicle or would not have paid as much for it had he known of the problems or risk associated with the vehicle's Dashboard Defect.

### 20.   Tennessee Plaintiff

43.     Plaintiff Jan Byrd is a citizen of Sevierville, Tennessee.  Ms. Byrd owns a 2012 GMC Sierra Denali, which was purchased used in or about 2016 for approximately $42,000 from Twin City Nissan in Knoxville, Tennessee.  Ms. Byrd's 2012 GMC Sierra Denali was covered by a written warranty.  Ms. Byrd also purchased and extended warranty for $3,800.  Prior to purchasing the vehicle, Ms. Byrd viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Twin City Nissan emphasized the quality, durability, and safety features.  In or about February 2017, Plaintiff Byrd noticed cracks to the left of the instrument cluster and near the side air-bag.  At the time that Ms. Byrd first noticed cracks the vehicle had approximately 48,000 miles.  In February 2017, Plaintiff Byrd contacted Twin City Buick GMC and GM to inquire

about scheduling a repair or replacement and was told the vehicle was out of warranty and that she would be responsible for the full cost of the replacement. Thereafter, Plaintiff Byrd contacted GM's customer service center and was also told that the vehicle was out of warranty and she would be responsible for the full cost of the replacement. The value of Ms. Byrd's vehicle has been diminished as a result of the Dashboard Defect. Ms. Byrd would not have purchased the vehicle or would not have paid as much for it had she known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

### 21.   Texas Plaintiffs

44.   Plaintiff Kacy Garner is a citizen of Whitesboro, Texas. Ms. Garner owns a 2014 GMC Yukon, which was purchased used in or about 2016 for approximately $30,743 from Holiday Chevrolet in Whitesboro, Texas. Ms. Garner's 2014 GMC Yukon was covered by a written warranty. Ms. Garner also purchased and extended warranty for $2,956.94. Prior to purchasing the vehicle, Ms. Garner viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at Holiday Chevrolet emphasized the quality, durability, and safety features of the vehicle. In or about June 2017, Ms. Garner noticed a crack near the passenger side airbag. At the time that Ms. Garner first noticed a crack the vehicle had approximately 58,000 miles. In or

about June 2017, Plaintiff Garner contacted Holiday Chevrolet to inquire about scheduling a repair or replacement and was told the extended warranty would not cover the repair or replacement of the cracked dashboard. In or about July 2017, Ms. Garner contacted GM to inquire about scheduling a repair or replacement and was told that GM contacted Holiday Chevrolet and it would cost Ms. Garner $1,000 to replace the dashboard.  GM would not offer any assistance with the cost of repairing or replacing the cracked dashboard.  The value of Ms. Garner's vehicle has been diminished as a result of the Dashboard Defect.  Ms. Garner would not have purchased the vehicle or would not have paid as much for it had she known of the Defective Dashboard's propensity to crack and/or that the defect can interfere with the planned deployment of the driver's-side and passenger's-side airbags.

45.    Plaintiff Morris Leondar is a citizen of Fort Worth, Texas.   Mr. Leondar owns a 2013 GMC Denali, which was purchased used in or about 2015 for approximately $38,000 from Moritz Chevrolet in Fort Worth, Texas.    Mr. Leondar's 2013 GMC Denali was covered by a written warranty.  Mr. Leondar also purchased an extended warranty for approximately $2,200.  Prior to purchasing the vehicle, Mr. Leondar viewed and heard commercials that touted GM's long record of durability and safety.  In or about December 2016, Plaintiff Leondar noticed cracks to the left of the instrument cluster and near the passenger side airbag.  At the time that Mr. Leondar first noticed cracks the vehicle had approximately 66,000

miles.  The value of Mr. Leondar's vehicle has been diminished as a result of the Dashboard Defect.  Mr. Leondar would not have purchased the vehicle or would not have paid as much for it had he known of the problems or risk associated with the vehicle's Dashboard Defect.

### 22.    Virginia Plaintiff

46.    Plaintiff Gregory D. Wiltshire is a citizen of Mechanicsville, Virginia. Mr. Wiltshire owns a 2011 Chevrolet Suburban 1500 Z71, which was purchased used in or about 2017 for approximately $21,950 from New Millennium Auto Sales in Mechanicsville, Virginia. Mr. Wiltshire's 2010 Chevrolet Suburban 1500 Z71 was covered by a written warranty. Mr. Wiltshire also purchased an extended warranty for $1,100.  Prior to purchasing the vehicle, Mr. Wiltshire viewed and heard commercials that touted GM's long record of durability and safety, and the sales representative at New Millennium Auto Sales emphasized the quality, durability, and safety features of the vehicle.  On or about 2017, Mr. Wiltshire noticed a crack near the passenger side airbag.  At the time that Mr. Wiltshire first noticed the crack, the vehicle had approximately 110,000 miles.  On or about 2017, Mr. Wilshire contacted Royal Chevrolet to inquire about scheduling a repair or replacement and was told it would cost $1,200 to $1,500 to replace. The value of Mr. Wiltshire's vehicle has been diminished as a result of the Dashboard Defect. Mr. Wiltshire would not have purchased the vehicle or would not have paid as

much for it had he known of the problems or risk associated with the vehicle's Dashboard Defect.

**B.      Defendant**

   **1.      General Motors Company, LLC**

47.      Defendant General Motors Company, LLC ("GM") is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan. The sole member and owner of General Motors LLC is General Motors Holding LLC. General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan. The sole member and owner of General Motors Holdings LLC is General Motors Company, which is a Delaware Corporation with its principal place of business in the State of Michigan, and is a citizen of the States of Delaware and Michigan. GM was re-incorporated in 2009 and, effective on July 10, 2009, acquired substantially all assets and assumed certain liabilities of General Motors Corporation through a Section 363 sale under Chapter 11 of the U.S. Bankruptcy Code.

48.      GM and/or its agents designed, manufactured, and installed Defective Dashboards in the GM Vehicles.  GM also developed, approved and disseminated the owner's manuals and warranty booklets, advertisements, and other promotional materials relating to the GM Vehicles.

49.     GM intends that its dealerships disseminate brochures, booklets and advertisements to potential consumers.   GM also communicates with its dealer network through service bulletins and through electronic mail.   All of these communications provided GM with an opportunity to disclose the truth about the GM Vehicles to dealers for dissemination to potential purchasers or owners.

## V.     FACTUAL ALLEGATIONS

### A.     The GM Vehicles

50.     All the GM Vehicles at issue suffer from the same Defective Dashboard.

51.     GM marketed, distributed, and purportedly warranted the GM Vehicles in the United States in a uniform manner.

52.     Through the years, and at all times relevant to this action, GM has marketed the GM Vehicles as the most dependable, longest lasting trucks on the road.   They use tag lines such as "We Are Professional Grade" and encourage consumers to "Live Like a Boss."

53.     One cannot hear Bob Seger's iconic song "Like A Rock" without immediately thinking of Chevy trucks and their purported durability and strength.

54.     In its 2010 Annual Report, GM stated:

> We truly are building a new GM, from the inside out.  Our
> vision is clear: to design, build, and sell the world's best
> vehicles, and we have a new business model to bring that
> vision to life . . . The company's progress is early evidence of

a new business model that begins and ends with great vehicles. (at 2, 3).

55.    The 2011 Annual Report went so far as state that "[e]very driver of a GM car, crossover or truck is a driver of our growth[,] . . . [and that] [GM is] putting our vision in motion by putting our customers first – executing our strategy to attract and delight more of them every day." (at 1)

56.    The 2012 Annual Report reinforced this "focus on the customer" and on "quality," stating that "[w]hat is immutable is [GM's] focus on the customer, which requires us to go from 'good' today to 'great' in everything we do, including product design, initial quality, durability, and service after the sale." (at 4); *See also* 2012 Annual Report at 10 ("Product quality and long-term durability are two other areas that demand our unrelenting attention, even though we are doing well on key measures").

57.    But, rather than having strong, dependable, rock-like durability, the Defective Dashboards are brittle and crack, and are inherently unsafe for the consumer.

## B.    The Defective Dashboard Cracks

58.    The cracks in the Defective Dashboards manifest in at least two areas of the instrument panel (Part No.: 232247): the steering column cowling, and passenger airbag area.



59.    Examples of the cracks are included here:



60.    On information and belief, GM's GMT800 truck platform series, the predecessor to the GMT900, utilized a multi-piece dashboard design. Notably, the GMT800 truck platform series did not exhibit the defect alleged here, *i.e.*, it did not crack. A schematic of the design is included here:



- 41 -

61.     On information and belief, GM made a design change to the dashboard in the GMT900 truck platform series by moving from a multi-piece design to a single piece design.  A schematic of the design and is included here:

 

62.     On information and belief, GM has used the same Defective Dashboard in each and every one of GM's GMT900 truck platform series vehicles that came off the line between 2007 and 2014, and GM has not remedied the defect in those model years.  As such, were a customer to replace the Defective Dashboard – which, including parts and labor, can exceed $2000 – that customer would receive another Defective Dashboard.

63.     On information and belief, in 2015 GM returned to a multi-piece dashboard design.  A schematic of the design is included here:



64.     On information and belief, there have been no complaints of cracking following the return to a multi-piece dashboard.

**C.     The Defective Dashboard is a Safety Risk.**

65.     The cracks can interfere with the planned deployment of the driver's-side and passenger's-side airbags, thus creating a safety risk.

66.     An airbag is a critical safety feature of any motor vehicle.  Airbags are meant to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield.   An airbag's inflator, as its name suggests, rapidly inflates the airbag upon vehicle impact.   In the milliseconds following a crash, the inflator ignites a propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand and deploy.

67.     When the airbag deploys, the defective dashboard in the GM Vehicles is more likely to splinter in unplanned and dangerous directions sending shrapnel into the passengers and/or lacerating the airbag and preventing it from deploying

properly.  In short, the Defective Dashboard creates a clear and present risk for potential for bodily harm.  Thus, Plaintiffs and the other members of the Class, as well as the general public, were and are subject to substantial safety risks resulting from the Defective Dashboard.

68.    GM's inaction with respect to the Defective Dashboard is a particularly callous in the context of the National Highway Traffic Safety Administration's ("NHTSA") scheduled recall of GM Vehicle's with defective Takata air bag inflators.

69.    The following table identifies the GM Vehicles subject to current or future recalls due to the defective Takata air bag inflators:

| Model Years | Make | Model |
|---|---|---|
| 2007 – 2008 | Chevrolet/GMC | Silverado/Sierra HD  PAB[3] |
| 2007 – 2008 | Chevrolet/GMC | Silverado/Sierra HD PAB |
| 2007 – 2011 | Chevrolet | Avalanche PAB |
| 2007 - 2008 | Chevrolet | Avalanche PAB |
| 2009 - 2011 | Chevrolet | Silverado HD PAB |
| 2007 – 2011 | Chevrolet | Silverado LD PAB |
| 2007 – 2008 | Chevrolet | Silverado LD PAB |
| 2007 - 2011 | Chevrolet | Suburban PAB |
| 2007 - 2008 | Chevrolet | Suburban PAB |
| 2007 – | Chevrolet | Tahoe PAB |

---

[3] "PAB" stands for passenger airbag.

- 44 -

| 2011 | | |
|---|---|---|
| 2007 – 2008 | Chevrolet | Tahoe PAB |
| 2009 - 2011 | GMC | Sierra HD PA |
| 2007 - 2011 | GMC | Sierra LD PAB |
| 2007 – 2008 | GMC | Sierra LD PAB |
| 2007 – 2011 | GMC | Yukon PAB |
| 2007 - 2008 | GMC | Yukon PAB |
| 2007 - 2011 | GMC | Yukon XL PAB |
| 2007 – 2008 | GMC | Yukon XL PAB |
| 2012 - 2012 | Chevrolet | Avalanche PAB |
| 2012 - 2012 | Chevrolet | Silverado HD PAB |
| 2012 - 2012 | Chevrolet | Silverado LD PAB |
| 2012 - 2012 | Chevrolet | Suburban PAB |
| 2012 - 2012 | Chevrolet | Tahoe PAB |
| 2012 - 2012 | GMC | Sierra HD PAB |
| 2012 - 2012 | GMC | Sierra LD PAB |
| 2012 - 2012 | GMC | Yukon PAB |
| 2012 - 2012 | GMC | Yukon XL PAB |
| 2009 - 2009 | Chevrolet | Avalanche PAB |
| 2007 - 2008 | Chevrolet | Avalanche PAB |
| 2009 - 2009 | Chevrolet | Silverado HD PAB |
| 2009 - 2009 | Chevrolet | Silverado LD PAB |
| 2007 - 2008 | Chevrolet | Silverado LD PAB |
| 2009 - 2009 | Chevrolet | Suburban PAB |
| 2007 - 2008 | Chevrolet | Suburban PAB |
| 2009 - 2009 | Chevrolet | Tahoe PAB |
| 2007 - 2008 | Chevrolet | Tahoe PAB |
| 2009 - 2009 | GMC | Sierra HD PAB |
| 2009 - 2009 | GMC | Sierra LD PAB |
| 2007 - 2008 | GMC | Sierra LD PAB |
| 2009 - 2009 | GMC | Yukon PAB |
| 2007 - 2008 | GMC | Yukon PAB |
| 2009 - 2009 | GMC | Yukon XL PAB |
| 2007 - 2008 | GMC | Yukon XL PAB |
| 2013 - 2013 | Chevrolet | Avalanche PAB |

| 2010 - 2010 | Chevrolet | Avalanche PAB |
| 2009 - 2009 | Chevrolet | Avalanche PAB |
| 2013 - 2013 | Chevrolet | Silverado HD PAB |
| 2010 - 2010 | Chevrolet | Silverado HD PAB |
| 2009 - 2009 | Chevrolet | Silverado HD PAB |
| 2013 - 2013 | Chevrolet | Silverado LD PAB |
| 2010 - 2010 | Chevrolet | Silverado LD PAB |
| 2009 - 2009 | Chevrolet | Silverado LD PAB |
| 2013 - 2013 | Chevrolet | Suburban PAB |
| 2010 - 2010 | Chevrolet | Suburban PAB |
| 2009 - 2009 | Chevrolet | Suburban PAB |
| 2013 - 2013 | Chevrolet | Tahoe PAB |
| 2010 - 2010 | Chevrolet | Tahoe PAB |
| 2009 - 2009 | Chevrolet | Tahoe PAB |
| 2013 - 2013 | GMC | Sierra HD PAB |
| 2010 - 2010 | GMC | Sierra HD PAB |
| 2009 - 2009 | GMC | Sierra HD PAB |
| 2013 - 2013 | GMC | Sierra LD PAB |
| 2010 - 2010 | GMC | Sierra LD PAB |
| 2009 - 2009 | GMC | Sierra LD PAB |
| 2013 - 2013 | GMC | Yukon PAB |
| 2010 - 2010 | GMC | Yukon PAB |
| 2009 - 2009 | GMC | Yukon PAB |
| 2013 - 2013 | GMC | Yukon XL PAB |
| 2010 - 2010 | GMC | Yukon XL PAB |
| 2009 - 2009 | GMC | Yukon XL PAB |
| 2011 - 2013 | Chevrolet | Avalanche PAB |
| 2010 - 2013 | Chevrolet | Avalanche PAB |
| 2014 - 2014 | Chevrolet | Silverado HD PAB |
| 2011 - 2014 | Chevrolet | Silverado HD PAB |
| 2010 - 2014 | Chevrolet | Silverado HD PAB |
| 2011 - 2013 | Chevrolet | Silverado LD PAB |
| 2010 - 2013 | Chevrolet | Silverado LD PAB |
| 2014 - 2014 | Chevrolet | Suburban PAB |
| 2011 - 2014 | Chevrolet | Suburban PAB |
| 2010 - 2014 | Chevrolet | Suburban PAB |
| 2014 - 2014 | Chevrolet | Tahoe PAB |
| 2011 - 2014 | Chevrolet | Tahoe PAB |
| 2010 - 2014 | Chevrolet | Tahoe PAB |

| 2014 - 2014 | GMC | Sierra HD PAB |
|---|---|---|
| 2011 - 2014 | GMC | Sierra HD PAB |
| 2010 - 2014 | GMC | Sierra HD PAB |
| 2011 - 2013 | GMC | Sierra LD PAB |
| 2010 - 2013 | GMC | Sierra LD PAB |
| 2014 - 2014 | GMC | Yukon PAB |
| 2011 - 2014 | GMC | Yukon PAB |
| 2010 - 2014 | GMC | Yukon PAB |
| 2014 - 2014 | GMC | Yukon XL PAB |
| 2011 - 2014 | GMC | Yukon XL PAB |
| 2010 - 2014 | GMC | Yukon XL PAB |

**D.     GM Has Had Knowledge of the Defective Dashboard.**

70.    GM knew that it was selling the GM Vehicles with Defective Dashboards.

71.    GM knew that the Defective Dashboard was caused by a systemic manufacturing, design, and/or installation defect because, among other reasons, the cracks occurred: (a) in an identical position on the defective part; (b) with nearly identical resulting damage to the defective part; (c) across all GM Vehicles; and (e) to thousands, if not tens of thousands, of GM Vehicles throughout the United States.

72.    As evidence of this knowledge, on information and belief, GM hired Delphi to investigate the root cause and, importantly, Delphi concluded that consumer use of common automotive cleaning products was not the cause of the cracking.

73.    On information and belief, GM also has had knowledge of the Defective Dashboards by virtue of the following:

- 47 -

a. Repeated calls and/or emails to GM from aggrieved consumers nationwide including but not limited to Doug Hanson, Krista Newble, Shane Kessinger, Andrew Fay, Emily Couch, Kelli Byrnes, Johnathon Bullard, Jeremy Peck, Jan Byrd.

a. Repeated calls to GM dealerships from aggrieved consumers including but not limited to James Smith, Robert Slover, Doug Hanson, Marissa Little, Krista Newble, Michael Strong, Chris Moebus, Shane Kessinger, Justin Small, Andrew Fay, Emily Couch, Bryan Sweeney, Daniel McCarthy, Rob Nestore, Johnathon Bullard, Steven Conti, Diane Kuczkowski, Kristy Marshall, Kenneth Sutton, Sr., Peter Thompson, Jan Byrd, Kacy Garner, Gregory D. Wiltshire. In fact, GM servicers and dealerships describe it as a "known defect."

b. Repeated communications with GM through GM's Facebook presence from aggrieved consumers including but not limited to James Smith and Robert Slover.

c. The National Highway Transportation Safety Administration's "SaferCar.gov" database is replete with complaints of cracked dashboards in GM Vehicles.

- 48 -

74. Despite knowledge of the defect and safety risk, no recall has been implemented by GM and GM continues to sell vehicles containing the defective and unsafe dashboards. And, as alleged above, when it has replaced the Defective Dashboard at the owner's expense, it has been with yet another Defective Dashboard.

75. Given that GM is (and has been) aware of the Defective Dashboard while still engaged in the manufacture and sale of the GM Vehicles, GM had (and still has) a duty to disclose and remedy the inherent safety risk associated with the Defective Dashboard.

76. GM concealed material information regarding the Defective Dashboards. This concealment allows GM to continue to sell and/or lease the GM Vehicles to Class members and avoid the expense of the repair or redesign necessary to properly address the Defective Dashboard.

77. GM was aware of the Defective Dashboard in the GM Vehicles after the GM Vehicles were manufactured. GM has received notice via numerous and myriad complaints about the Defective Dashboard, but to date has failed to recall the GM Vehicles or otherwise address the defect in any meaningful way.

78. By manufacturing and selling the GM Vehicles and by failing to disclose that such vehicles contain a Defective Dashboard. GM defrauded its

customers by omission, and engaged in fraud and unfair and deceptive conduct under federal and state law.

79.    GM received notice of the Defective Dashboard from Plaintiffs and class members. When Plaintiffs and class members bring their GM Vehicles to GM authorized dealers and service shops to repair the Defective Dashboard, it is, on information and belief, GM's policy to retain the Defective Dashboards after they are removed.   Thus, GM was apprised of the Defective Dashboard in its GM Vehicles and maintains exclusive control and authority over the Defective Dashboards.

80.    GM had ample opportunity to disclose these important facts given that it engaged in national advertising campaigns for the GM Vehicles on the Internet, in print, on the radio, and on television, and distributed GM Vehicle brochures to dealers for provision to potential customers.   Plaintiffs and the Class also would have been aware of the deception had GM disclosed the Defective Dashboards to GM Vehicle dealerships given that, but for the rare exception, each Plaintiff interacted with and received information from sales representatives at authorized GM dealerships prior to purchasing their GM Vehicles.   GM routinely communicates with consumers through GM's authorized dealerships via product brochures, special service messages, technical service bulletins, and warranty

programs.  GM had ample opportunity to disclose its omissions to Plaintiffs and the proposed Class through these channels and more, but failed to do so.

81.    GM's omissions were material. Had GM disclosed the Defective Dashboards, Plaintiffs would not have purchased the GM Vehicles, or would have paid less for them.

82.    Within the first years of selling the GM Vehicles, GM was aware that the Defective Dashboards' design, manufacturing, and/or installation renders them prone to cracking.

83.    Nevertheless, GM did not re-engineer the dashboard design, manufacturing, and/or installation, and did not change is marketing.  And, despite longstanding knowledge that it was selling a defective product, GM never notified existing customers of the defect.

84.    In sum, GM has sold and continues to sell a uniformly "inferior" and inherently "defective" product that does not meet industry standards and is not suitable for its ordinary use.

85.    GM undertook a nationwide marketing and sales campaign that intentionally hid the defect and made false claims that GM knew the product did not meet, but were used to induce customers to purchase GM Vehicles or replace the Defective Dashboards at their own cost.

86.    GM used unfair, false, and deceptive tactics to fend off, minimize, ignore, and deny customer complaints and warranty claims.

87.    As a result of GM's wrongdoing, Plaintiffs and the class members suffered multiple injuries, including paying (and overpaying) for GM Vehicles that they otherwise would not have bought, and paying more for repairs than they otherwise would have.

88.    As evidence of this knowledge, on information and belief, GM hired Delphi to investigate the root cause of the defect. Importantly, despite GM's blame-the-consumer strategy, Delphi concluded that consumer use of common automotive cleaning products was not the cause of the cracking.

89.    The National Highway Transportation Safety Administration's "SaferCar.gov" database is replete with complaints of cracked dashboards in GM Vehicles.

90.    Despite knowledge of the defect and safety risk, no recall has been implemented by GM and GM continues to sell vehicles containing the defective and unsafe dashboards.

91.    Given that GM is (and has been) aware of the Defective Dashboards while still engaged in the manufacture and sale of the GM Vehicles, GM had (and still has) a duty to disclose and remedy the inherent safety risk associated with the Defective Dashboards.

- 52 -

92.    GM concealed material information regarding the Defective Dashboards.  This concealment allows GM to continue to sell and/or lease the GM Vehicles to Class members and avoid the expense of the repair or redesign necessary to properly address the Defective Dashboard.

93.    As a result of GM's continued concealment of the Defective Dashboards, Plaintiffs and the Class had no knowledge of the Defective Dashboard prior to purchasing their GM Vehicles.  Additionally, GM has systematically refused to fully repair the Defective Dashboards, while actively concealing that a design, manufacturing, and/or installation defect exists in the GM Vehicles.

94.    GM's uniform failure to disclose this defect constitutes both an actionable omission and an unfair, unlawful, fraudulent, and deceptive business practice in violation of the consumer protection statutes of numerous states, among other violations discussed below.

95.    GM had the knowledge and capability to notify purchasers and lessees of the defect, and to repair (at its own expense) those defective parts of the GM Vehicles.

96.    GM, however, chose to conceal the defect and let purchasers and lessees drive unsafe vehicles or suffer out-of-pocket repair costs and reduction in value of their vehicles.  Indeed, rather than issuing a recall or repairing the defect

under its warranty, GM chose to make (and continues to make) substantial revenues off its Defective Dashboards – all at the expense and detriment to its customers.

97.     GM's actions in knowingly selling vehicles with defective dashboards while failing to inform its customers of the defect despite the potential presence of a safety risk is at odds with GM's extensive marketing campaign. Indeed, throughout the class period GM repeatedly proclaimed to the world and U.S. consumers that it was committed to innovation, safety, and maintaining a strong brand.

98.     GM acted contrary to the carefully crafted image it was trumpeting to Plaintiffs and members of the Class.    Specifically, GM continued to install dashboards in vehicles knowing the dashboards were substandard and posed substantial safety risks to passengers. Plaintiffs bring this action individually and on behalf of a proposed nationwide class of similarly situated owners and lessees of GM Vehicles and on behalf of subclasses of similarly situated GM Vehicle owners and lessees in Alabama, Arizona, California, Colorado, Connecticut, Florida, Illinois, Indiana, Kansas, Louisiana, Massachusetts, Michigan, Minnesota, Missouri, New Jersey, New Mexico, North Carolina, Ohio, Pennsylvania, Tennessee, Texas, and Virginia.

## E.     Replacement of the Defective Dashboard

99.     As alleged above, the cost to fix or replace a Defective Dashboard can exceed $2,000, including parts and labor.  Perversely, GM "fixes" or "replaces" the

Defective Dashboard with yet another Defective Dashboard.  In fact, as alleged above, Plaintiff Rob Nestore paid for a replacement Defective Dashboard that subsequently cracked in substantially the same location or locations as the original Defective Dashboard.  Plaintiff Michael Strong also paid to replace his Defective Dashboard and received another Defective Dashboard in its place.

## VI.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Discovery Rule Tolling

100.   Plaintiffs and class members did not discover, and could not have discovered through the exercise of reasonable diligence, that their GM Vehicles' dashboards suffered from a systemic design, manufacturing, and/or installation defect and that GM had misrepresented, and omitted material facts concerning, the superior quality and durability of the Defective Dashboards within the time period of any applicable statutes of limitation.

101.   Among other things, Plaintiffs did not know and could not have known that the dashboards regularly crack in other similar vehicles as a result of the Defective Dashboards' design, manufacturing, and/or installation and/or that GM was aware of the widespread and common defect. Among other things, GM knew that the Defective Dashboards were defectively designed, manufactured, and/or installed, lacked durability, and were not free from visual defects and defects in materials and workmanship.

102.   Plaintiffs and Class members had no way of knowing about the defects in dashboards and the other information concealed by GM.  GM systematically lied to Plaintiffs and Class members concerning the qualities of the Defective Dashboards.  When problems were discovered, GM claimed there was no defect, and provided other reasons for the Defective Dashboards' uniform and consistent cracking.

103.   Further, GM has repeatedly and consistently misled Plaintiffs and the Class by engaging in extensive misdirection towards the Plaintiffs and the Class. GM repeatedly represented that to the extent any customers had experienced cracking of their Defective Dashboards that it was a product of the customers' care and maintenance of the Defective Dashboards and denied warranty claims – something their own consultant, Delphi, proved otherwise.

104.   Even now, GM denies that the cracking of the Defective Dashboards is the result of the product's design, manufacturing, and/or installation.

105.   Plaintiffs and Class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that GM knew that its products were defective, nor would a reasonable and diligent investigation have disclosed that GM had information in its possession about the existence of defects and that GM opted to conceal, and still conceals, information about the defect.

106. Within the period of any applicable statutes of limitation, Plaintiffs and Class members could not have discovered through the exercise of reasonable diligence that GM was concealing defects in its Defective Dashboards.

107. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to the GM Vehicles.

## B.    Fraudulent Concealment Tolling

108. All applicable statutes of limitation have also been tolled by GM's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.GM knew that the Defective Dashboards were defective each time it sold and installed a GMT900 truck platform series vehicle, as well as each and every instance when GM repaired and replaced a Defect Dashboard with another Defective Dashboard.  GM further knew that the defects in the product would not be evident to a buyer and that buyers reasonably relied on GM's superior technical knowledge and claimed "testing" of the products it was selling.  Further, GM intentionally concealed from, or failed to notify, Plaintiffs, Class members, and the public of the defective product, and the true quality, performance, and durability of the Defective Dashboards.

109. GM knowingly manufactured, marketed, sold, and installed the Defective Dashboards well after it knew, or had reason to know, the dashboards were defective in their composition, design, engineering, and/or installation, and yet

GM never amended or updated its marketing, promotional, or sales material used universally by GM and provided to Plaintiffs and Class members.

110.   GM's fraudulent concealment was uniform across all class members; GM concealed from everyone the true nature of the Defective Dashboards.

## C.   Estoppel

111.   GM was under a continuous duty to disclose to Plaintiffs and the other Class members the true character, quality, and nature of the Defective Dashboards.

112.   Instead, GM knowingly, affirmatively, and actively concealed or recklessly disregarded the true character, quality, and nature of the Defective Dashboards and made misrepresentations, and material omissions, about the quality, reliability, characteristics, and performance of the Defective Dashboards in its communications with consumers.

113.   Among other things, GM reassured Plaintiffs and Class members that the problems that they were having with the Defective Dashboards were not related to any defect in the dashboards or the fault of GM.

114.   Based on the foregoing, GM is estopped from relying on any statutes of limitations in defense of this action.

## VII.   CLASS ALLEGATIONS

115.   Plaintiffs bring this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all

others similarly situated.  Plaintiffs seek to represent a Class under the laws of the State of Michigan (the "Nationwide Class" or "Class") initially defined as:  All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series) in the United States.  Excluded from the Nationwide Class are New GM, its employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of New GM, New GM Dealers; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case, and all persons within the third degree of relationship to any such persons.

116.  Additionally, Plaintiffs seek to represent the following sub-classes (collectively, the "State Sub-Classes") initially defined as follows:

> a.  All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in

the State of Alabama and/or who purchased or leased said vehicle in Alabama ("the Alabama Sub-Class").

b. All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the State of Arizona and/or who purchased or leased said vehicle in Arizona ("the Arizona Sub-Class").

c. All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the State of California and/or who purchased or leased said vehicle in California ("the California Sub-Class").

d. All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009

(which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the State of Colorado and/or who purchased or leased said vehicle in Colorado ("the Colorado Sub-Class").

e.  All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the State of Connecticut and/or who purchased or leased said vehicle in Connecticut ("the Connecticut Sub-Class").

f.  All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in

the State of Florida and/or who purchased or leased said vehicle in Florida ("the Florida Sub-Class").

g.  All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the State of Illinois and/or who purchased or leased said vehicle in Illinois ("the Illinois Sub-Class").

h.  All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the State of Indiana and/or who purchased or leased said vehicle in Indiana ("the Indiana Sub-Class").

i.  All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009

(which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the State of Kansas and/or who purchased or leased said vehicle in Kansas ("the Kansas Sub-Class").

j. All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the State of Louisiana and/or who purchased or leased said vehicle in Louisiana ("the Louisiana Sub-Class").

k. All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in

the State of Michigan and/or who purchased or leased said vehicle in Michigan ("the Michigan Sub-Class").

l.  All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the State of Minnesota and/or who purchased or leased said vehicle in Minnesota ("the Minnesota Sub-Class").

m. All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the State of Missouri and/or who purchased or leased said vehicle in Missouri ("the Missouri Sub-Class").

n.  All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009

(which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the State of New Jersey and/or who purchased or leased said vehicle in New Jersey ("the New Jersey Sub-Class").

o. All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the State of New Mexico and/or who purchased or leased said vehicle in New Mexico ("the New Mexico Sub-Class").

p. All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in

the State of North Carolina and/or who purchased or leased said vehicle in North Carolina ("the North Carolina Sub-Class").

q.  All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the State of Ohio and/or who purchased or leased said vehicle in Ohio ("the Ohio Sub-Class").

r.  All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the Commonwealth of Pennsylvania and/or who purchased or leased said vehicle in Pennsylvania ("the Pennsylvania Sub-Class").

s.  All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the State of Tennessee and/or who purchased or leased said vehicle in Tennessee ("the Tennessee Sub-Class").

t.  All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series, GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the State of Texas and/or who purchased or leased said vehicle in Texas ("the Texas Sub-Class").

u.  All current and former owners or lessees of a GMT900 truck platform series vehicle manufactured after July 11, 2009 (which incorporate model years 2009-2014 of the Chevrolet Silverado series, GMC Sierra series, Chevrolet Tahoe series,

GMC Yukon series, Cadillac Escalade series, Chevrolet Suburban series and Chevrolet Avalanche series), residing in the Commonwealth of Virginia and/or who purchased or leased said vehicle in Virginia ("the Virginia Sub-Class").

117. Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

118. This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

119. **Numerosity**. Federal Rule of Civil Procedure 23(a)(1): The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiffs are informed and believe that there are at least thousands of members of the Class, the precise number of Class members is unknown to Plaintiffs, but may be ascertained from GM's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

120.   **Commonality and Predominance**. Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3):  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

   a.  Whether GM engaged in the conduct alleged herein;

   b.  Whether GM designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed GM Vehicles into the stream of commerce in the United States;

   c.  Whether GM designed, manufactured, marketed, and distributed GM Vehicles with Defective Dashboards;

   d.  Whether Plaintiffs and the other Class members overpaid for their GM Vehicles and/or did not receive the benefit of the bargain;

   e.  Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount.

   f.  Whether GM's alleged conduct constitutes the use or employment of an unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation within the meaning of the applicable state consumer fraud statutes;

   g.  Whether GM has been unjustly enriched under applicable state laws;

   h.  Whether GM has violated its express warranties to Plaintiffs and the Class members;

   i.  Whether GM has violated the implied warranty of merchantability under applicable state law;

j. Whether GM actively concealed the defect in the Defective Dashboards in order to maximize profits to the detriment of Plaintiffs and the Class members; and

k. Such other common factual and legal issues as are apparent from the allegations and causes of action asserted in this Complaint.

121. **Typicality.**  Federal Rule of Civil Procedure 23(a)(3):     Plaintiffs' claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through GM's wrongful conduct as described above.  All claims seek recovery on the same legal theories and are based upon GM's common course of conduct.

122. **Adequacy.**  Federal Rule of Civil Procedure 23(a)(4):     Plaintiffs are adequate Class representatives because their interests do not conflict with the interests of the other members of the Classes they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously.  The Classes' interests will be fairly and adequately protected by Plaintiffs and their counsel.

123. **Declaratory Relief.**  Federal Rule of Civil Procedure 23(b)(2):  GM has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate declaratory relief, with respect to each Class as a whole.

124. **Superiority.**  Federal Rule of Civil Procedure 23(b)(3):  A class action is superior to any other available means for the fair and efficient adjudication of this

controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against GM, so it would be impracticable for the members of the Classes to individually seek redress for GM's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VIII.  CLAIMS

### A.    Claims Brought on Behalf of the Nationwide Class

#### COUNT I

#### FRAUDULENT CONCEALMENT

125.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

126.  Plaintiffs bring this claim on behalf of themselves and the Nationwide Class under the common law of fraudulent concealment, which is materially uniform in all states.  In the alternative, Plaintiffs bring this claim on behalf of each

state subclass under the law of each state in which Plaintiffs and Class members purchased or leased the GM Vehicles.

127.  GM fraudulently concealed and suppressed material facts concerning: (1) the quality of its GM Vehicles and the GM brand, (2) the culture of GM—a culture characterized by an emphasis on cost-cutting, the studious avoidance of safety issues, and shoddy design, manufacturing, and/or installation processes, and (3) the Defective Dashboards installed on GM Vehicles.  Additionally, GM fraudulently concealed and suppressed that it valued cost-cutting over safety and that it took steps to ensure that its employees did not reveal known defects to regulators or consumers.

128.  Despite advertising its vehicles, including the GM Vehicles, as strong, dependable, and durable, GM knew when it manufactured, marketed, and sold or leased the GM Vehicles that the Defective Dashboards suffered from a systemic manufacturing, design, and/or installation defect that reduced the vehicles' value and compromised the safe deployment of the vehicles' airbags.

129. GM failed to disclose these facts to consumers at the time it manufactured, marketed, and sold or leased the GM Vehicles and/or GM knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit. Through its active concealment and/or suppression of these material facts, GM

sought to increase consumer confidence in the GM Vehicles, and to falsely assure purchasers and lessors of the same that the vehicles are of sound quality and that GM is a reputable manufacturer that stands behind the automobiles it manufactures. GM engaged in this behavior to protect its profits, avoid warranty replacements, avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

130.   Plaintiffs and Class members were unaware, and could not reasonably discover on their own, that GM's representations were false and misleading, or that it had omitted material facts relating to the GM Vehicles.

131.   GM had a duty to disclose, rather than conceal and suppress, the full scope and extent of the defects in the Defective Dashboards installed on GM Vehicles because:

a. GM had exclusive or far superior knowledge of the defect in the Defective Dashboards and concealment thereof;

b. the facts regarding the defect in the Defective Dashboards and concealment thereof were known and/or accessible only to GM;

c.  GM knew that Plaintiffs and Class members did not know about, or could not reasonably discover, the defect in the Defective Dashboards and concealment thereof; and

d.  GM made representations and assurances about the qualities of the GM Vehicles, including statements about their strength, dependability, and durability that were misleading, deceptive, and incomplete without the disclosure of the fact that the Defective Dashboards installed on those vehicles suffered from a systemic manufacturing, design, and/or installation defect.

132.  These omitted and concealed facts were material because a reasonable consumer would rely on them in deciding to purchase or lease the GM Vehicles, and because they substantially reduced the value of the GM Vehicles purchased or leased by Plaintiffs and the Class members.  Whether the GM Vehicles were defective, of sound quality, and safe, and whether GM stood behind such vehicles, would have been an important factor in Plaintiffs' and Class members' decision to purchase or lease the vehicles.  Plaintiffs and Class members trusted GM not to sell them vehicles that were defective, exposed them to an unreasonable risk of harm, and were significantly overpriced.

133.  GM intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their GM Vehicles were free from known defects, as represented by Defendant and reasonably expected by consumers.

134.  Plaintiffs and the class members were unaware of these omitted material facts and would have paid less for the GM Vehicles, or would not have

purchased them at all, if they had known of the concealed and suppressed facts. Plaintiffs and Class members did not receive the benefit of their bargain due to GM's fraudulent concealment. Plaintiffs' and class members' actions in purchasing the GM Vehicles were justified. GM was in exclusive control of the material facts and such facts were not known or reasonably knowable to the public, Plaintiffs, or Class members.

135. Plaintiffs and Class members relied to their detriment upon GM's reputation, fraudulent misrepresentations, and material omissions regarding the strength, dependability, and durability of the GM Vehicles.

136. As a direct and proximate result of GM's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiffs and Class members suffered injury. They purchased GM Vehicles that had a diminished value by reason of GM's concealment of, and failure to disclose, the defects in the Defective Dashboards. Plaintiffs and Class members also paid substantial money to repair or replace the Defective Dashboards.

137. Accordingly, GM is liable to the Nationwide Class and/or State Sub-Classes for their damages in an amount to be proven at trial.

138. On information and belief, GM has still not made full and adequate disclosure and continues to defraud Plaintiffs and the Class members. GM also continues to conceal material information regarding the Defective Dashboards.

139.   GM's acts were done deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class members' rights.   GM's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT II

## UNJUST ENRICHMENT

140.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

141.   Plaintiffs bring this cause of action on behalf of themselves and the Nationwide class under Michigan law.   In the alternative, Plaintiffs bring this claim on behalf of each State Subclass under the law of each state in which Plaintiffs and Class members purchased or leased GM Vehicles.

142.   Plaintiffs bring this claim as an alternative to the contractual warranty claims asserted below and in the event that Plaintiffs prevail on their claims that any contract with GM (including any express or implied warranty) was fraudulently induced and/or Plaintiffs prevail in proving that the warranties cannot be enforced by GM due to GM having provided the warranties only after entering into a contract with a purchaser or lessor, or due to GM's intentional and deceptive efforts to conceal the defects in the Defective Dashboards and avoid its warranty obligations.

143.   GM has received millions in revenue from the sale of the GM Vehicles between 2009 and 2014.

144.   This revenue was a benefit conferred upon GM by Plaintiffs and Class members, individuals living across the United States.

145.   GM manufactured, marketed, and sold defective GM Vehicles to Plaintiffs and Class members, while actively concealing the vehicles' known defects and touting their quality, strength, dependability, and durability.

146.   GM benefitted from selling defective cars for more money than they were worth, at a profit, and Plaintiffs have overpaid for the cars and, in some instances, been forced to pay to replace or repair the Defective Dashboards.

147.   Plaintiffs and Class members elected to purchase the GM Vehicles based on GM's misrepresentations, deception, and omissions.  GM knew and understood that it would (and did) receive a financial benefit, and voluntarily accepted the same, from Plaintiffs and Class members when they elected to purchase the GM Vehicles.

148.   The GM Vehicles' defect, and GM's concealment of the same, enriched GM beyond its legal rights by securing through deceit and falsehood millions of dollars in revenues between 2009 and 2014.

149.   Therefore, because GM will be unjustly enriched if it is allowed to retain the revenues obtained through falsehoods, deception, and misrepresentations,

Plaintiffs and each Class member are entitled to recover the amount by which GM was unjustly enriched at his or her expense.

150.   Accordingly, Plaintiffs, on behalf of themselves and each Class member, seek damages against GM in the amounts by which it has been unjustly enriched at Plaintiffs' and each Class member's expense, and such other relief as this Court deems just and proper.

## COUNT III

## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. § 2301, ET SEQ.

151.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

152.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

153.   The GM Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

154.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

155.   GM is a "supplier" and "warrantor" within the meaning of the Magnuson- Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

156.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

157.   GM provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, GM warranted that the GM Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

158.   GM breached its implied warranties, as described in more detail above, and is therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the GM Vehicles share common design defects in that they are equipped with defective dashboard panels that are susceptible to cracking and shattering around the steering column and passenger air bag, resulting in severe quality and safety issues. Through its practice to partially cover replacement costs, GM has tacitly admitted that the GM Vehicles suffer from a Defective Dashboard of its own making, but GM's refusal to fully cover replacement costs and acknowledge the defect in order to inform current and future purchasers of GM Vehicles is woefully insufficient.

159.   In its capacity as a warrantor, GM had knowledge of the inherent defect in the GM Vehicles. Any effort by GM to limit the implied warranties in a manner that would exclude coverage of the GM Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the GM Vehicles is null and void.

160.   Any limitations GM might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between GM and Plaintiffs and the other Class members, as, at the time of purchase and lease, Plaintiffs and the other Class members had no other options for purchasing warranty coverage other than directly from GM.

161.   Any limitations GM might seek to impose on its warranties are substantively unconscionable. GM knew that the GM Vehicles were defective and would continue to pose safety risks and quality concerns after the warranties purportedly expired. GM failed to disclose these defects to Plaintiffs and the other Class members. Thus, GM's enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

162.   Plaintiffs and each of the other Class members have had sufficient direct dealings with either GM or its agents (dealerships) to establish privity of contract between GM, on the one hand, and Plaintiffs and each of the other Class members, on the other hand. Nonetheless, privity is not required here because

Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between GM and its dealers, and specifically, of GM's implied warranties. The dealers were not intended to be the ultimate consumers of the GM Vehicles and have no rights under the warranty agreements provided with the GM Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the GM Vehicles are dangerous instrumentalities due to the aforementioned defects and nonconformities.

163.   Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give GM notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

164.   Plaintiffs and the other Class members would suffer economic hardship if they returned their GM Vehicles but did not receive the return of all payments made by them. Because GM is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not reaccepted their GM Vehicles by retaining them.

165.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class

members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

166. Plaintiffs seek the establishment of the GM-funded program for Plaintiffs and Class members to recover out of pocket costs incurred in attempting to rectify the Defective Dashboard in their vehicles.

**B.    Claims Brought on Behalf of the Alabama Subclass**

<div align="center">

**COUNT IV**

**VIOLATIONS OF THE ALABAMA DECEPTIVE
TRADE PRACTICES ACT
(ALA. CODE § 8-19-1 ET SEQ.)
(BROUGHT ON BEHALF OF THE "ALABAMA CLASS")**

</div>

167. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

168. Plaintiffs and the Alabama Class members are "consumers" within the meaning of Ala. Code § 8-19-3(2).

169. Plaintiffs, the Alabama Class members, and Defendant are "persons" within the meaning of Ala. Code § 8-19-3(5).

<div align="center">- 82 -</div>

170. The GM Vehicles are "goods" within the meaning of Ala. Code § 8-19-3(3).

171. Defendant was and is engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

172. The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including, but not limited to: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," "(24) In selling a motor vehicle, failing to disclose material damage to the motor vehicle as prescribed hereafter….," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

173. In the course of GM's business, GM concealed the Defective Dashboard in GM Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Accordingly, GM engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that GM Vehicles are of a particular standard and quality when they are not; failing to reveal a

material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

174.   From the date of its re-incorporation on July 10, 2009, GM knew or should have known of the Defective Dashboard inherent in GM Vehicles, both because of the knowledge of personnel retained at GM, GM service centers, and authorized GM dealerships, and continuous reports, investigations, and notifications from vehicle owners, lessees, and regulatory authorities.

175.   GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy the Defective Dashboard in all GM Vehicles. GM concealed this information as well.

176.   GM had a duty to disclose the existence of the Defective Dashboard in the GM Vehicles. By failing to disclose and by actively concealing the Defective Dashboard in GM Vehicles, by marketing its vehicles as safe, reliable, and of high

quality, and by presenting itself as a reputable manufacturer that valued quality and stood behind its vehicles after they were sold, GM engaged in deceptive business practices in violation of the Alabama DTPA.

177.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the quality of the GM Vehicles and GM brand, and the true value of the GM Vehicles.

178.   Plaintiffs and Alabama Class members reasonably relied upon the Defendant's false misrepresentations and unfair or deceptive acts or practices.  They had no way of knowing that the Defendant's representations were false and gravely misleading.   As alleged herein, Defendant engaged in extremely sophisticated methods of deception.  Plaintiffs and Alabama Class members did not, and could not, unravel the Defendant's deception on their own.

179.   GM intentionally and knowingly failed to disclose and misrepresented material facts regarding the GM Vehicles with intent to mislead Plaintiffs and the Alabama Class.

180.   GM knew or should have known that its conduct violated the Alabama DTPA.

181.   GM owed Plaintiffs and the Alabama Class a duty to disclose the defective condition of the GM Vehicles because GM:

a.  Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured; and

b.  Intentionally concealed the foregoing from Plaintiffs and the Alabama Class; and

c.  Made incomplete representations that it warranted defective components in the GM Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

182.  GM's concealment of the Defective Dashboard in GM Vehicles was material to Plaintiffs and the Alabama Class. A vehicle made by a reputable manufacturer of quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of inferior vehicles that conceals defects rather than promptly remedies them.

183.  Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have

purchased these GM Vehicles, would have paid less, and/or would not have continued to drive their unsafe vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class members' actions were justified. GM was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

184.   GM's actions as set forth above occurred in the conduct of trade or commerce.

185.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

186.   As a direct and proximate result of GM's violations of the Alabama DTPA, Plaintiffs and the Alabama Class have suffered injury-in-fact and/or actual damage.

187.   Plaintiffs and the Alabama Class suffered ascertainable loss caused by GM's misrepresentations and its failure to disclose material information. Had they been aware of the Defective Dashboard that existed in GM Vehicles, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

188.   GM's violations present a continuing risk and disservice to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

189.   The repairs instituted by GM have not been adequate.

190.   Pursuant to ALA. CODE § 8-19-10(a), Plaintiffs and the Alabama Class seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial, and (b) $100 for each Plaintiff and each Alabama Class Member, in addition to treble damages.

191.   Plaintiffs and the Alabama Class also seek declaratory relief, punitive damages, an order enjoining GM's unfair, unlawful, and/or deceptive practices, and reasonable attorneys' fees and costs, as well as other proper and just relief under the Alabama DTPA.

## COUNT V

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (ALA. CODE §§ 7-2-314 AND 7-2A-212)
### (BROUGHT ON BEHALF OF THE "ALABAMA CLASS")

192.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

193.   This count is brought on behalf of the Alabama Class against Defendant.

194.   Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under Ala. Code §§ 7-2-104(1) and 7-2A-103(3), and "sellers" of motor vehicles under § 7-2-103(1)(d).

195.   With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Ala. Code. § 7-2A-103(1)(p).

196.   The GM Vehicles are and were at all relevant times "goods" within the meaning of Ala. Code §§ 7-2-105(1) and 7-2A-103(1)(h).

197.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ala. Code §§ 7-2-314 and 7-2A-212.

198.   These GM Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the GM Vehicles are inherently defective in that the dashboards are designed, manufactured, and/or installed in such a way that they will crack. This Defective Dashboard renders the GM vehicles unsafe and reduces their value.

199.   GM was provided notice of these issues by the numerous consumer complaints against it regarding the Defective Dashboard and by numerous individual letters and communications sent by Plaintiffs and others within a

- 89 -

reasonable amount of time after the allegations of GM Vehicle defects became public.

200.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the other Alabama Class members have been damaged in an amount to be proven at trial.

C.   **Claims Brought on Behalf of the Arizona Subclass**

### COUNT VI

### VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT (ARIZ. REV. STAT. §§ 44-1521, *ET SEQ.*) (BROUGHT ON BEHALF OF THE "ARIZONA CLASS")

201.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

202.   This count is brought on behalf of the Arizona State Class against Defendant.

203.   Defendant and Arizona State Class members are "persons" within the meaning of Ariz. Rev. Stat. § 44-1521(6).

204.   The GM Vehicles are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

205.   The Arizona Consumer Fraud Act ("Arizona CFA") provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, … misrepresentation, or concealment, suppression or omission of

any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale … of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."  Ariz. Rev. Stat. § 44-1522(A).

206.   In the course of its business, GM violated the Arizona CFA by knowingly misrepresenting and intentionally concealing material facts regarding the durability, reliability, and performance of the GM Vehicles, as detailed above. Specifically, in marketing, offering for sale, and selling the Defective Dashboards, GM engaged in deceptive acts or practices, as outlined in Ariz. Rev. Stat. § 441522(A), including using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the GM Vehicles.

207.   Defendant's scheme and concealment of the true characteristics of the Defective Dashboards were material to the Arizona State Class, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that the Arizona State Class would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, the Arizona State Class would not have purchased the GM Vehicles, or would have paid significantly less for them.

208.   The Arizona State Class members had no way of discerning that GM's representations were false and misleading, or otherwise learning the facts that Defendant had concealed or failed to disclose.

209.   Defendant had an ongoing duty to the Arizona State Class to refrain from unfair and deceptive practices under the Arizona CFA in the course of their business.  Specifically, Defendant owed the Arizona State Class members a duty to disclose all the material facts concerning the GM Vehicles because GM possessed exclusive knowledge, intentionally concealed it from the Arizona State Class, and/or made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

210.   The Arizona State Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

211.   The Arizona State Class seeks an order awarding damages and any other just and proper relief available under the Arizona CFA.

## COUNT VII

## BREACH OF IMPLIED WARRANTIES
## (BROUGHT ON BEHALF OF THE "ARIZONA CLASS")

212.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

213.   This count is brought on behalf of the Arizona Class against Defendant.

214.   Defendant is and was at all relevant times "merchants" with respect to the GM Vehicles under ARIZ. REV. STAT. § 47-2104(A), and "sellers" of the GM Vehicles under § 47-2103(A)(4).

215.   With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under ARIZ. REV. STAT.

216.   The GM Vehicles are and were at all relevant times "goods" within the meaning of ARIZ. REV. STAT. § 47-2105(A).

217.   A warranty that the GM Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to ARIZ. REV. STAT. § 47-2314.

218.   In addition, a warranty that the GM Vehicles were fit for their particular purpose is implied by law pursuant to ARIZ. REV. STAT. § 47-2315. Defendant knew at the time of sale of the GM Vehicles that the Arizona Class intended to use the vehicles in a manner requiring a particular standard of performance and durability, and that the Arizona Class was relying on Defendant's skill and judgment to furnish suitable products for this particular purpose.

219.   The GM Vehicles, when sold and at all times thereafter, were not in merchantable condition, not fit for their ordinary purpose, and were not fit for their

particular purpose as a result of their inherent defects, as detailed above. In addition, because any warranty repairs or replacements offered by Defendant cannot cure the defect in the GM Vehicles, it fails to cure Defendant's breach of implied warranties.

220.   As a direct and proximate result of Defendant's breach of its implied warranties, the Arizona Class members have been damaged in an amount to be determined at trial.

221.   Defendant was provided notice of the issues raised in this Count and this Complaint as detailed above.

**D.      Claims Brought on Behalf of the California Subclass**

**COUNT VIII**

**VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION LAW**
**(CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*)**
**(BROUGHT ON BEHALF OF THE "CALIFORNIA CLASS")**

222.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

223.   This claim is brought on behalf of the California Class.

224.   California's Unfair Competition Law ("UCL"), Business and Professions Code § 17200, prohibits any "unlawful, unfair, or fraudulent business act or practices."

225.   In the course of its business, Defendant violated the UCL by engaging in the following unlawful, fraudulent, and unfair business acts and practices:

a.   Knowingly and intentionally concealing from Plaintiffs and the other California Class members that the GM Vehicles suffer from a defect while obtaining money from Plaintiffs and Class members;

b.   Marketing the GM Vehicles as durable, reliable,  and defect-free; and

c.   Violating California statutory and common law prohibiting false advertising, fraudulent concealment and breach of implied warranty.

226.   Defendant's scheme and concealment of the true characteristics of the GM Vehicles were material to Plaintiffs and the California Class, and Defendant misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the California Class would rely on the misrepresentations, concealments, and omissions.   Had they known the truth, Plaintiffs and the California Class would not have purchased the GM Vehicles, or would have paid significantly less for them.

227.   Plaintiffs and California Class members suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's misrepresentations and their concealment of and failure to disclose material information.

228.   Pursuant to CAL. BUS. & PROF. CODE § 17200, Plaintiffs and the California Class seek any such orders or judgments as may be necessary to restore to Plaintiffs and California Class members any money acquired by unfair competition, including restitution and/or restitutionary disgorgement, as provided in CAL. BUS. & PROF. CODE §§ 17203 and 3345, and any other just and proper relief available under the California UCL.

## COUNT IX

**VIOLATIONS OF THE CALIFORNIA CONSUMER LEGAL REMEDIES ACT (CAL. CIV. CODE §§ 1750, *ET SEQ.*) (BROUGHT ON BEHALF OF THE "CALIFORNIA CLASS")**

229.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

230.   This claim is brought on behalf of the California Subclass.

231.   California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, proscribes "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer."

232.   The GM Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

233.   Plaintiffs and the California Class members are "consumers" as defined in Cal. Civ. Code § 1761(d), and Plaintiffs, the California Class members, and GM are "persons" as defined in Cal. Civ. Code § 1761(c).

234.   As alleged above, GM made representations concerning the durability, performance, and safety features of the GM Vehicles that were misleading.

235.   In purchasing or leasing the GM Vehicles, Plaintiffs and other California Class members were deceived by GM's failure to disclose the Dashboard Defect.

236.   GM's conduct, as described hereinabove, was and is in violation of the CLRA and  violates at least the following enumerated CLRA provisions:

        a.  Cal. Civ. Code § 1770(a)(2): Misrepresenting the approval or certification of goods;

        b.  Cal. Civ. Code § 1770(a)(3): Misrepresenting the certification by another;

        c.  Cal. Civ. Code § 1770(a)(5): Representing that goods have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have;

        d.  Cal. Civ. Code § 1770(a)(7): Representing that goods are of a particular standard, quality, or grade, if they are of another;

        e.  Cal. Civ. Code § 1770(a)(9): Advertising goods with intent not to sell them as advertised; and

f.  Cal. Civ. Code § 1770(a)(16): Representing that goods have been supplied in accordance with a previous representation when they have not.

237.  GM intentionally and knowingly failed to disclose and misrepresented material facts regarding the GM Vehicles with an intent to mislead Plaintiffs and California Class members.

238.  In purchasing or leasing the GM Vehicles, Plaintiffs and the California Class members were deceived by GM's failure to disclose the Defective Dashboard, as described above.

239.  Plaintiffs and the California Class members reasonably relied upon GM's material omissions and false misrepresentations.  They had no way of knowing that GM's representations were false and gravely misleading.  Plaintiffs and the California Class members did not, and could not, unravel GM's deception on their own.

240.  GM knew or should have known that its conduct violated the CLRA.

241.  GM owed Plaintiffs and the California Class members a duty to disclose the truth about its emissions systems manipulation because GM:

a.  Possessed exclusive knowledge that it manipulated the emissions system in the GM Vehicles to turn off or limit effectiveness in normal driving conditions;

b. Intentionally concealed the foregoing from Plaintiffs and the California Class members; and/or

c. Made incomplete representations that the Defective Dashboard was merely cosmetic, while purposefully withholding material facts from Plaintiffs and the California Class members that contradicted these representations.

242. GM had a duty to disclose that the GM Vehicles were defective, because, having volunteered to provide information to Plaintiffs and the California Class members, GM had the duty to disclose not just the partial truth, but the entire truth.

243. Further, Plaintiffs and the California Class members relied on GM's material omissions and representations that the GM Vehicles they were purchasing were free from defects.

244. Plaintiffs and the California Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased the GM Vehicles, or would have paid less for them. Plaintiffs' and the California Class members' actions were justified. GM was in exclusive control

of the material facts, and such facts were not generally known to the public, Plaintiffs, or the California Class members.

245. GM's conduct proximately caused injuries to Plaintiffs and the California Class members.

246. Plaintiffs and the California Class members were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of GM's conduct in that Plaintiff and the other Subclass members overpaid for their GM Vehicles and did not receive the benefit of their bargain, and their GM Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of GM's misrepresentations and omissions.

247. GM's violations present a continuing risk to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

248. GM knew, should have known, or was reckless in not knowing of the defective design, manufacture, and/or installation of the Defective Dashboards, and that the GM Vehicles were not suitable for their intended use.

249. The facts concealed and omitted by GM from Plaintiffs and the California Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease the GM Vehicles or pay a lower price. Had Plaintiffs and the California Class members

known about the defective nature of the GM Vehicles, they would not have purchased or leased the GM Vehicles or would not have paid the prices they paid.

250.   Plaintiffs and the California Class members have provided GM with notice of its violations of the CLRA pursuant to Cal. Civ. Code § 1782(a).

251.   Plaintiffs' and the California Class members' injuries were proximately caused by GM's unlawful and deceptive business practices.

252.   Plaintiffs and the California Class members are entitled to recover actual and punitive damages under the CLRA pursuant to Civil Code § 1780(a), and an additional award of up to $5,000 to each Plaintiff and Subclass member who is a "senior citizen."

## COUNT X

**VIOLATIONS OF THE CALIFORNIA FALSE ADVERTISING LAW
(CAL. BUS. & PROF. CODE §§ 17500, *ET SEQ.*)
(BROUGHT ON BEHALF OF THE "CALIFORNIA CLASS")**

253.   Plaintiffs incorporate by reference all paragraphs as though fully set forth herein.

254.   This claim is brought on behalf of the California Class.

255.   California Bus. & Prof. Code § 17500 states:  "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before

the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

256.   GM caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to GM, to be untrue and misleading to consumers, including Plaintiffs and the California Class members.

257.   GM has violated § 17500 because the misrepresentations and omissions regarding the durability, safety, functionality and reliability of the GM Vehicles as set forth in this Complaint were material and likely to deceive a reasonable consumer.

258.   Plaintiffs and the California Class members have suffered an injury in fact, including the loss of money or property, as a result of GM's unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their GM Vehicles, Plaintiffs and the California Class members relied on the misrepresentations and/or omissions of GM with respect to the durability, reliability, and safety of the GM Vehicles. GM's representations turned out not to be true because during normal driving conditions the Defective Dashboard cracks. Had Plaintiffs and the California Class

members known this, they would not have purchased or leased their GM Vehicles and/or paid as much for them. Accordingly, Plaintiffs and the other California Subclass members overpaid for their GM Vehicles and did not receive the benefit of their bargain.

259. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of GM's business. GM's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

260. Plaintiffs, individually and on behalf of the California Class, request that this Court enter such orders or judgments as may be necessary to restore to Plaintiffs and the other Subclass members any money GM acquired by unfair competition, including restitution and/or restitutionary disgorgement and for such other relief as may be appropriate.

## COUNT XI

### BREACH OF IMPLIED WARRANTIES
### (CAL. COM. CODE §§ 2314 AND 2315)
### (BROUGHT ON BEHALF OF THE "CALIFORNIA CLASS")

261. Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

262. This count is brought on behalf of the California State Class against Defendant.

263.   Defendant is and was at all relevant times a "merchant" with respect to the GM Vehicles under CAL. COM. CODE § 2104(1), and "seller" of the GM Vehicles under § 2103(1)(d).

264.   The GM Vehicles are and were at all relevant times "goods" within the meaning of CAL. COM. CODE § 2105(1).

265.   A warranty that the GM Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to CAL. COM. CODE § 2314.

266.   In addition, a warranty that the GM Vehicles were fit for their particular purpose is implied by law pursuant to CAL. COM. CODE § 2315. Defendant knew at the time of sale that the California Class intended to use the GM Vehicles for a purpose requiring a particular standard of performance and durability, and that the California State Class was relying on Defendant's skill and judgment to furnish suitable products for this particular purpose.

267.   The GM Vehicles, when sold and at all times thereafter, were not in merchantable condition, not fit for their ordinary purpose, and were not fit for their particular purpose as a result of their inherent defects, as detailed above. In addition, because any warranty repairs or replacements offered by Defendant cannot cure the defect in the GM Vehicles, they fail to cure Defendant's breach of implied warranties.

268.   As a direct and proximate result of Defendant's breach of its implied warranties, the California Class members have been damaged in an amount to be determined at trial.

269.   Defendant was provided notice of the issues raised in this Count and this Complaint as detailed above.

**E.   Claims Brought on Behalf of the Colorado Subclass**

<div align="center">

**COUNT XII**

**VIOLATIONS OF THE COLORADO CONSUMER PROTECTION ACT**
**(COLO. REV. STAT. § 6-1-101, *ET SEQ.*)**
**(BROUGHT ON BEHALF OF THE "COLORADO CLASS")**

</div>

270.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

271.   GM, Plaintiffs and the Colorado State Class members are "persons" within the meaning of § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), COLO. REV. STAT. § 6-1-101, *et seq.*   Plaintiffs and the Colorado State Class members are "consumers" within the meaning of COL. REV. STAT § 6-1-113(1)(a).

272.   The Colorado CPA makes unlawful deceptive trade practices in the course of a person's business.

273.   In the course of their business, GM violated the Colorado CPA by knowingly misrepresenting and intentionally concealing material facts regarding the

<div align="center">

- 105

</div>

durability, reliability, safety, and performance of the GM Vehicles, as detailed above.

274.   Specifically, in marketing, offering for sale, and selling the defective GM Vehicles, GM engaged in one or more of the following unfair or deceptive acts or practices as defined in COLO. REV. STAT. § 6-1-105:

    a.  Representing that the GM Vehicles have characteristics or benefits that they do not have;

    b.  Representing that the GM Vehicles are of a particular standard and quality when they are not;

    c.  Advertising the GM Vehicles with the intent not to sell them as advertised; and/or

    d.  Failing to disclose material information concerning the GM Vehicles known to GM at the time of advertisement or sale, with the intention of inducing Plaintiffs and the Colorado State Class members to purchase GM Vehicles.

275.   Defendant's scheme and concealment of the true characteristics of the GM Vehicles were material to Plaintiffs and the Colorado State Class, and GM misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the Colorado State Class would rely on the misrepresentations, concealments, and omissions.   Had they known the truth, Plaintiffs and the

Colorado State Class would not have purchased the GM Vehicles, or would have paid significantly less for them.

276.   Plaintiffs and the Colorado State Class members had no way of discerning that Defendant's representations were false and misleading, or otherwise learning the facts that GM had concealed or failed to disclose.

277.   GM had an ongoing duty to Plaintiffs and the Colorado State Class to refrain from unfair and deceptive practices under the Colorado CPA in the course of its business.   Specifically, GM owed Plaintiffs and the Colorado State Class members a duty to disclose all the material facts concerning the GM Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiffs and the Colorado State Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

278.   Plaintiffs and the Colorado State Class members suffered ascertainable loss and actual damages as a direct and proximate result of GM's concealment, misrepresentations, and/or failure to disclose material information.

279.   Pursuant to COLO. REV. STAT. § 6-1-113, Plaintiffs and the Colorado State Class seek an order awarding damages, treble or punitive damages, and any other just and proper relief available under the Colorado CPA.

## COUNT XIII

### BREACH OF IMPLIED WARRANTIES
### (COLO. REV. STAT. §§ 4-2-314 AND 4-2-315)
### (BROUGHT ON BEHALF OF THE "COLORADO CLASS")

280.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

281.   GM is and was at all relevant times a "merchant" with respect to the GM Vehicles under COLO. REV. STAT. § 4-2-104(1), and a "seller" of the GM Vehicles under § 4-2-103(1)(d).

282.   The GM Vehicles are and were at all relevant times "goods" within the meaning of COLO. REV. STAT. § 4-2-105(1).

283.   A warranty that the GM Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to COLO. REV. STAT. § 4-2-314. 440.   In addition, a warranty that the GM Vehicles were fit for their particular purpose is implied by law pursuant to COLO. REV. STAT. § 4-2-315. GM knew at the time of sale of the GM Vehicles that Plaintiffs and the Colorado State Class intended to use the vehicles in a manner requiring a particular standard of performance and durability, and that Plaintiffs and the Colorado State Class were relying on GM's skill and judgment to furnish suitable products for this particular purpose.

284.   The GM Vehicles, when sold and at all times thereafter, were not in merchantable condition, not fit for their ordinary purpose, and were not fit for their particular purpose as a result of their inherent defects, as detailed above.   In addition, because any warranty repairs or replacements offered by GM cannot cure the defect in the GM Vehicles, they fail to cure GM's breach of implied warranties.

285.   As a direct and proximate result of GM's breach of its implied warranties, Plaintiffs and the Colorado State Class members have been damaged in an amount to be determined at trial.

286.   GM was provided notice of the issues raised in this Count and this Complaint as detailed above.

**F.      Claims Brought on Behalf of the Connecticut Subclass**

**COUNT XIV**

**VIOLATION OF CONNECTICUT UNLAWFUL TRADE PRACTICES ACT
(CONN. GEN. STAT. § 42-110A, ET SEQ.)
(BROUGHT ON BEHALF OF THE "CONNECTICUT CLASS")**

287.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

288.   GM, Plaintiffs, and the Connecticut State Class members are "persons" within the meaning of CONN. GEN. STAT. § 42-110a(3) of the Connecticut Unfair Trade Practices Act ("Connecticut UTPA").   GM is engaged in "trade" or "commerce" within the meaning of CONN. GEN. STAT. § 42-110a(4).

289.   The Connecticut UTPA provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." CONN. GEN. STAT. § 42-110b(a).

290.   In the course of their business, GM violated the Connecticut UTPA by knowingly misrepresenting and intentionally concealing material facts regarding the durability, reliability, safety, and performance of the GM Vehicles, as detailed above.  Specifically, in marketing, offering for sale, and selling the defective GM Vehicles, GM engaged in one or more of the following unfair or deceptive acts or practices in violation of CONN. GEN. STAT. § 42-110b(a):

     a.   Representing that the GM Vehicles have characteristics or benefits that they do not have;

     b.   Representing that the GM Vehicles are of a particular standard and quality when they are not;

     c.   Advertising the GM Vehicles with the intent not to sell them as advertised;

     d.   Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

     e.   Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment,

suppression or omission, in connection with the advertisement and sale of the GM Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

291.   GM's scheme and concealment of the true characteristics of the GM Vehicles were material to Plaintiffs and the Connecticut State Class, and GM misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the Connecticut State Class would rely on the misrepresentations, concealments, and omissions.   Had they known the truth, Plaintiffs and the Connecticut State Class would not have purchased the GM Vehicles, or would have paid significantly less for them.

292.   Plaintiffs and the Connecticut State Class members had no way of discerning that GM's representations were false and misleading, or otherwise learning the facts that GM had concealed or failed to disclose.

293.   GM had an ongoing duty to Plaintiffs and the Connecticut State Class to refrain from unfair and deceptive practices, in the course of its business, including a duty to disclose all material facts concerning the GM Vehicles because it possessed exclusive knowledge that was intentionally concealed and withheld and/or GM made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

294.   Plaintiffs and the Connecticut State Class members suffered ascertainable loss and actual damages as a direct and proximate result of GM's concealment, misrepresentations, and/or failure to disclose material information.

295.   Pursuant to CONN. GEN. STAT. § 42-110g, Plaintiffs and the Connecticut State Class seek an order and awarding damages, punitive damages, and any other just and proper relief available under the Connecticut UTPA.

## COUNT XV

### BREACH OF IMPLIED WARRANTIES
### (CONN. GEN. STAT. ANN. §§ 42A-2-314 AND 42A-2-315)
### (BROUGHT ON BEHALF OF THE "CONNECTICUT CLASS")

296.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

297.   GM is and was at all relevant times a "merchant" with respect to the GM Vehicles under CONN. GEN. STAT. ANN. § 42a-2-104(1), and a "seller" of the GM Vehicles under § 42a-2-103(1).

298.   The GM Vehicles are and were at all relevant times "goods" within the meaning of CONN. GEN. STAT. ANN. § 42a-2-105(1).

299.   A warranty that the GM Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to CONN. GEN. STAT. ANN. § 42A-2-314.

300.   In addition, a warranty that the GM Vehicles were fit for their particular purpose is implied by law pursuant to CONN. GEN. STAT. ANN. § 42A-2-315.   GM knew at the time of sale of the GM Vehicles that Plaintiffs and the Connecticut State Class intended to use the vehicles in a manner requiring a particular standard of performance and durability, and that Plaintiffs and the Connecticut State Class were relying on GM's skill and judgment to furnish suitable products for this particular purpose.

301.   The GM Vehicles, when sold and at all times thereafter, were not in merchantable condition, not fit for their ordinary purpose, and were not fit for their particular purpose as a result of their inherent defects, as detailed above.   In addition, because any warranty repairs or replacements offered by GM cannot cure the defect in the GM Vehicles, they fail to cure GM's breach of implied warranties.

302.   As a direct and proximate result of GM's breach of its implied warranties, Plaintiffs and the Connecticut State Class members have been damaged in an amount to be determined at trial.

303.   GM was provided notice of the issues raised in this Count and this Complaint as detailed above.

G.      **Claims Brought on Behalf of the Florida Subclass**

## COUNT XVI

## VIOLATION OF FLORIDA'S UNFAIR &
## DECEPTIVE TRADE PRACTICES ACT
## (FLA. STAT. § 501.201, *ET SEQ.*)
## (BROUGHT ON BEHALF OF THE "FLORIDA CLASS")

304.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

305.    Plaintiffs and the Florida State Class members are "consumers" within the meaning of FLA. STAT. § 501.203(7).

306.    GM is engaged in "trade" or "commerce" within the meaning of FLA. STAT. § 501.203(8).

307.    The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") makes unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" FLA. STAT. § 501.204(1).

308.    In the course of their business, GM violated the FDUTPA by knowingly misrepresenting and intentionally concealing material facts regarding the durability, reliability, safety, and performance of the GM Vehicles, as detailed above.  Specifically, in marketing, offering for sale, and selling the defective GM Vehicles, GM engaged in one or more of the following unfair or deceptive acts or practices prohibited by FLA. STAT. § 501.204(1):

- 114 -

a.  Representing that the GM Vehicles have characteristics or benefits that they do not have;

b.  Representing that the GM Vehicles are of a particular standard and quality when they are not;

c.  Advertising the GM Vehicles with the intent not to sell them as advertised;

d.  Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

e.  Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale of the GM Vehicles.

309.   GM's scheme and concealment of the true characteristics of the GM Vehicles were material to Plaintiffs and the Florida State Class, and GM misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the Florida State Class would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiffs and the Florida State Class would not have purchased the GM Vehicles, or would have paid significantly less for them.

310.   Plaintiffs and the Florida State Class members had no way of discerning that GM's representations were false and misleading, or otherwise learning the facts that GM had concealed or failed to disclose.

311.   GM had an ongoing duty to Plaintiffs and the Florida State Class to refrain from unfair and deceptive practices under the FDUTPA in the course of its business.  Specifically, GM owed Plaintiffs and the Florida State Class members a duty to disclose all the material facts concerning the GM Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiffs and the Florida State Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

312.   Plaintiffs and the Florida State Class members suffered ascertainable loss and actual damages as a direct and proximate result of GM's concealment, misrepresentations, and/or failure to disclose material information.

## COUNT XVII

### BREACH OF IMPLIED WARRANTIES
### (FLA. STAT. §§ 672.314 AND 672.315)
### (BROUGHT ON BEHALF OF THE "FLORIDA CLASS")

313.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

314.   GM is and was at all relevant times a "merchant" with respect to the GM Vehicles under FLA. STAT. § 672.104(1), and a "seller" of the GM Vehicles under § 672.103(1)(d).

315.   The GM Vehicles are and were at all relevant times "goods" within the meaning of FLA. STAT. § 672.105(1).

316.   A warranty that the GM Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to FLA. STAT. § 672.314.

317.   In addition, a warranty that the GM Vehicles were fit for their particular purpose is implied by law pursuant to FLA. STAT. § 672.315. GM knew at the time of sale of the GM Vehicles that Plaintiffs and the Florida State Class intended to use those vehicles in a manner requiring a particular standard of performance and durability, and that Plaintiffs and the Florida State Class were relying on GM's skill and judgment to furnish suitable products for this particular purpose.

318.   The GM Vehicles, when sold and at all times thereafter, were not in merchantable condition, not fit for their ordinary purpose, and were not fit for their particular purpose as a result of their inherent defects, as detailed above.   In addition, because any warranty repairs or replacements offered by GM cannot cure the defect in the GM Vehicles, they fail to cure GM's breach of implied warranties.

319.   As a direct and proximate result of GM's breach of its implied warranties, Plaintiffs and the Florida State Class members have been damaged in an amount to be determined at trial.

320.   GM was provided notice of the issues raised in this Count and this Complaint as detailed above.

**H.      Claims Brought on Behalf of the Illinois Subclass**

<div align="center">

**COUNT XVIII**

**VIOLATION OF ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT
(815 ILCS 505/1, ET SEQ. AND 510/2)
(BROUGHT ON BEHALF OF THE "ILLINOIS CLASS")**

</div>

321.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

322.   GM, Plaintiffs, and the Illinois State Class members are "persons" within the meaning 815 ILCS 505/1(c) and 510/1(5).   Plaintiffs and the Illinois State Class members are "consumers" within the meaning of 815 ILCS 505/1(e).

323.   The Illinois Consumer Fraud and Deceptive Practices Act ("Illinois CFA") makes unlawful "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact … in the conduct of trade or commerce … whether

any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2. The Illinois CFA further makes unlawful deceptive trade practices undertaken in the course of business. 815 ILCS 510/2.

324. In the course of their business, GM violated the Illinois CFA by knowingly misrepresenting and intentionally concealing material facts regarding the durability, reliability, safety, and performance of the GM Vehicles, as detailed above. Specifically, in marketing, offering for sale, and selling the defective GM Vehicles, GM engaged in one or more of the following unfair or deceptive acts or practices prohibited by 815 ILCS 505/2 and 510/2:

    a. Representing that the GM Vehicles have characteristics or benefits that they do not have;

    b. Representing that the GM Vehicles are of a particular standard and quality when they are not;

    c. Advertising the GM Vehicles with the intent not to sell them as advertised;

    d. Engaging in other conduct which created a likelihood of confusion or of misunderstanding; and/or

    e. Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment,

suppression or omission, in connection with the advertisement and sale of the GM Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

325. GM's scheme and concealment of the true characteristics of the GM Vehicles were material to Plaintiffs and the Illinois State Class, and GM misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiffs and the Illinois State Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, Plaintiffs and the Illinois State Class would not have purchased the GM Vehicles, or would have paid significantly less for them.

326. Plaintiffs and the Illinois State Class members had no way of discerning that GM's representations were false and misleading, or otherwise learning the facts that GM had concealed or failed to disclose.

327. GM had an ongoing duty to Plaintiffs and the Illinois State Class to refrain from unfair and deceptive practices under the Illinois CFA in the course of its business. Specifically, GM owed Plaintiffs and the Illinois State Class members a duty to disclose all the material facts concerning the GM Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from Plaintiffs and the Illinois State Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

328.   Plaintiffs and the Illinois State Class members suffered ascertainable loss and actual damages as a direct and proximate result of GM's concealment, misrepresentations, and/or failure to disclose material information.

329.   GM's violations present a continuing risk to Plaintiffs and the Illinois State Class, as well as to the general public.   GM's unlawful acts and practices complained of herein affect the public interest.

330.   Pursuant to 815 ILCS 505/10a(a) and 510/3, Plaintiffs and the Illinois State Class seek an order awarding damages, punitive damages, and any other just and proper relief available under the Illinois CFA.

## COUNT XIX

### BREACH OF IMPLIED WARRANTIES
### (810 ILL. COMP. STAT. §§ 5/2-314 AND 5/2-315)
### (BROUGHT ON BEHALF OF THE "ILLINOIS CLASS")

331.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

332.   GM is and was at all relevant times a "merchant" with respect to the GM Vehicles under 810 ILL. COMP. STAT. § 5/2-104(1), and a "seller" of the GM Vehicles under § 5/2-103(1)(d).

333.   The GM Vehicles are and were at all relevant times "goods" within the meaning of 810 ILL. COMP. STAT. § 5/2-105(1).

334.   A warranty that the GM Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to 810 ILL. COMP. STAT. § 5/2-314.

335.   In addition, a warranty that the GM Vehicles were fit for their particular purpose is implied by law pursuant to 810 ILL. COMP. STAT. § 5/2-315. GM knew at the time of sale of the GM Vehicles that Plaintiffs and the Illinois State Class intended to use the vehicles in a manner requiring a particular standard of performance and durability, and that Plaintiffs and the Illinois State Class were relying on GM's skill and judgment to furnish suitable products for this particular purpose.

336.   The GM Vehicles, when sold and at all times thereafter, were not in merchantable condition, not fit for their ordinary purpose, and were not fit for their particular purpose as a result of their inherent defects, as detailed above.   In addition, because any warranty repairs or replacements offered by GM cannot cure the defect in the GM Vehicles, they fail to cure GM's breach of implied warranties.

337.   As a direct and proximate result of GM's breach of its implied warranties, Plaintiffs and the Illinois State Class members have been damaged in an amount to be determined at trial.

338.   GM was provided notice of the issues raised in this Count and this Complaint as detailed above.

I.     **Claims Brought on Behalf of the Indiana Subclass**

## COUNT XX

**VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT**
**(IND. CODE § 24-5-0.5-3)**
**(BROUGHT ON BEHALF OF THE "INDIANA CLASS")**

339.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

340.   GM is a "person" within the meaning of IND. CODE § 24-5-0.5-2(2) and a "supplier" within the meaning of IND. CODE § 24-5-0.5-2(a)(3).

341.   Plaintiffs' and Indiana Class members' purchases of the GM Vehicles are "consumer transactions within the meaning of IND. CODE § 24-5-0.5-2(a)(1).

342.   Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive trade practice," which includes, but is not limited to, representing: "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably

- 123 -

know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

343.   In the course of its business, GM concealed the Defective Dashboard in GM Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Accordingly, GM engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that GM Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

- 124

344.   From the date of its re-incorporation on July 10, 2009, GM knew or should have known of the Defective Dashboard inherent of GM Vehicles, both because of the knowledge of personnel retained at GM, GM service centers and authorized GM dealerships, and continuous reports, investigations, and notifications from regulatory authorities.

345.   GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy the Defective Dashboard in all GM Vehicles. GM concealed this information as well.

346.   GM had a duty to disclose the existence of the Defective Dashboard in the GM Vehicles. By failing to disclose and by actively concealing the Defective Dashboard in GM Vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued quality and stood behind its vehicles after they were sold, GM engaged in deceptive business practices in violation of the Indiana DCSA.

347.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the quality of the GM Vehicles and GM brand, and the true value of the GM Vehicles.

- 125

348.   Plaintiffs and Indiana Class members reasonably relied upon the Defendant's false misrepresentations and unfair or deceptive acts or practices.  They had no way of knowing that the Defendant's representations were false and gravely misleading.   As alleged herein, Defendant engaged in extremely sophisticated methods of deception.  Plaintiffs and Indiana Class members did not, and could not, unravel the Defendant's deception on their own.

349.   GM intentionally and knowingly failed to disclose and misrepresented material facts regarding the GM Vehicles with intent to mislead Plaintiffs and the Indiana Class.

350.   GM knew or should have known that its conduct violated the Indiana DCSA.

351.   GM owed Plaintiffs and the Indiana Class a duty to disclose the defective condition of the GM Vehicles because GM:

> a.   Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

b. Intentionally concealed the foregoing from Plaintiffs and the Indiana Class; and

c. Made incomplete representations that it warranted defective components in the GM Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

352.  GM's concealment of the Defective Dashboard in GM Vehicles was material to Plaintiffs and the Indiana Class. A vehicle made by a reputable manufacturer of quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of inferior vehicles that conceals defects rather than promptly remedies them.

353.  Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased these GM Vehicles, would have paid less, and/or would not have continued to drive their unsafe vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class members' actions were justified. GM was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

354.   GM's actions as set forth above occurred in the conduct of trade or commerce.

355.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

356.   As a direct and proximate result of GM's violations of the Indiana DCSA, Plaintiffs and the Indiana Class have suffered injury-in-fact and/or actual damage.

357.   Plaintiffs and the Indiana Class suffered ascertainable loss caused by GM's misrepresentations and its failure to disclose material information. Had they been aware of the Defective Dashboard that existed in GM Vehicles, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

358.   GM's violations present a continuing risk and disservice to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

359.   The repairs instituted by GM have not been adequate.

360.   As a direct and proximate result of GM's violations of the Indiana DCSA, Plaintiffs and the Indiana Class have suffered injury-in-fact and/or actual damage.

361.   Plaintiffs and the Indiana Class seek monetary relief, declaratory relief, treble damages, punitive damages and attorneys' fees against GM in an amount to be determined at trial.

362.   Plaintiffs also seek an order enjoining GM's unfair, unlawful, and/or deceptive practices and any other just and proper relief available under the Indiana DCSA.

## COUNT XXI

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (IND. CODE §§ 26-1-2-314 AND 26-1-2.1-212)
### (BROUGHT ON BEHALF OF THE "INDIANA CLASS")

363.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

364.   Plaintiffs bring this Count on behalf of the Indiana Class.

365.   Defendant is and was at all relevant times a "merchant" with respect to motor vehicle sales under Ind. Code §§ 26-1-2-104(1) and 26-1-2.1-103(3), and a "seller" of motor vehicles under § 26-1-2-103(1)(d).

366.   With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Ind. Code § 26-1-2.1-103(1)(p).

367.   The GM Vehicles are and were at all relevant times "goods" within the meaning of Ind. Code §§ 26-1-2-105(1) and 26-1-2.1-103(1)(h).

368.   A warranty that the GM Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ind. Code §§ 26-1-2-314 and 26-1-2.1-212.

369.   These GM Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the GM Vehicles are inherently defective in that the dashboards are designed, manufactured, and/or installed in such a way that they will crack. This Defective Dashboard renders the GM Vehicles unsafe and reduces their value.

370.   GM was provided notice of these issues by the numerous consumer complaints against it regarding the Defective Dashboard and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of GM Vehicle defects became public.

371.   As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs and the other Indiana Class members have been damaged in an amount to be proven at trial.

J.      **Claims Brought on Behalf of the Kansas Subclass**

## COUNT XXII

**VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT**
**(KAN. STAT. ANN. § 50-623 ET SEQ.)**
**(BROUGHT ON BEHALF OF THE "KANSAS CLASS")**

372.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

373.   Plaintiffs and the Kansas Class members are "consumers," within the meaning of Kan. Stat. Ann. § 50-624(b).

374.   76.   Each Defendant is a "supplier" under the Kansas Consumer Protection Act ("Kansas CPA"), Kan. Stat. Ann. § 50-624(l).

375.   751.   The sale of the GM Vehicles to the Kansas Class Members was a "consumer transaction" within the meaning of Kan. Stat. Ann. § 50-624(c).

376.   752. The Kansas CPA states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction," Kan. Stat. Ann. § 50-626(a), and that deceptive acts or practices include, but are not limited to: (1) knowingly making representations or with reason to know that "(A) Property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have;" and "(D) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation;" "(2) the willful use, in any oral or

written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;" and "(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact."  The Kansas CPA also provides that "[n]o supplier shall engage in any unconscionable act or practice in connection with a consumer transaction." Kan. Stat. Ann. § 50-627(a).

377.  In the course of GM's business, GM concealed the Defective Dashboard in GM Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Accordingly, GM engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that GM Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

378.  From the date of its re-incorporation on July 10, 2009, GM knew or should have known of the Defective Dashboard inherent in GM Vehicles, both

because of the knowledge of personnel retained at GM, GM service centers, and authorized GM dealerships, and continuous reports, investigations, and notifications from regulatory authorities.

379.   GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy the Defective Dashboard in all GM Vehicles. GM concealed this information as well.

380.   GM had a duty to disclose the existence of the Defective Dashboard in the GM Vehicles. By failing to disclose and by actively concealing the Defective Dashboard in GM Vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued quality and stood behind its vehicles after they were sold, GM engaged in deceptive business practices in violation of the Kansas CPA.

381.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the quality of the GM Vehicles and GM brand, and the true value of the GM Vehicles.

382.   Plaintiffs and Kansas Class members reasonably relied upon the Defendant's false misrepresentations and unfair or deceptive acts or practices.  They

had no way of knowing that the Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated methods of deception. Plaintiffs and Kansas Class members did not, and could not, unravel the Defendant's deception on their own.

383. GM intentionally and knowingly failed to disclose and misrepresented material facts regarding the GM Vehicles with intent to mislead Plaintiffs and the Kansas Class.

384. GM knew or should have known that its conduct violated the Kansas CPA.

385. GM owed Plaintiffs and the Kansas Class a duty to disclose the defective condition of the GM Vehicles because GM:

  a. Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured; and

  b. Intentionally concealed the foregoing from Plaintiffs and the Kansas Class.

        c.      Made incomplete representations that it warranted defective components in the GM Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

386. GM's concealment of the Defective Dashboard in GM Vehicles was material to Plaintiffs and the Kansas Class. A vehicle made by a reputable manufacturer of quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of inferior vehicles that conceals defects rather than promptly remedies them.

387. Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased these GM Vehicles, would have paid less, and/or would not have continued to drive their unsafe vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class members' actions were justified. GM was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

388. GM's actions as set forth above occurred in the conduct of trade or commerce.

389.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

390.   GM still has not made full and adequate disclosures, and continue to defraud Plaintiffs and Kansas Class members by concealing material information regarding the Defective Dashboard.

391.   As a direct and proximate result of GM's violations of the Kansas CPA, Plaintiffs and the Kansas Class have suffered injury-in-fact and/or actual damage.

392.   Plaintiffs and the Kansas Class suffered ascertainable loss caused by GM's misrepresentations and its failure to disclose material information. Had they been aware of the Defective Dashboard that existed in GM Vehicles, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

393.   GM's violations present a continuing risk and disservice to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

394.   The repairs instituted by GM have not been adequate.

395.   Pursuant to Kan. Stat. Ann. § 50-634, Plaintiffs and the Kansas Class seek monetary relief against GM measured as the greater of (a) actual damages in

an amount to be determined at trial and (b) statutory damages in the amount of $10,000 for each Plaintiff and Kansas Class member, in addition to treble damages.

396.   Plaintiffs also seek declaratory relief, punitive damages, an order enjoining the Defendant's unfair, unlawful, and/or deceptive practices, and reasonable attorneys' fees and costs, as well as any other just and proper relief available under Kan. Stat. Ann. § 50-623 et seq.

## COUNT XXIII

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (KAN. STAT. §§ 84-2-314 AND 84-2A-212) (BROUGHT ON BEHALF OF THE "KANSAS CLASS")

397.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

398.   Defendant is and was at all relevant times a "merchant" with respect to motor vehicle sales under Kan. Stat. §§ 84-2-104(1) and 84-2A-103(3), and a "seller" of motor vehicles under § 84-2-103(1)(d).

399.   With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under Kan. Stat. § 84-2A-103(1)(p)

400.   The GM Vehicles are and were at all relevant times "goods" within the meaning of Kan. Stat. §§ 84-2-105(1) and 84-2A-103(1)(h).

401.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Kan. Stat. §§ 84-2-314 and 84-2A-212.

402.   These GM Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the GM Vehicles are inherently defective in that the dashboards are designed, manufactured, and/or installed in such a way that they will crack. This Defective Dashboard renders the GM vehicles unsafe and reduces their value.

403.   GM was provided notice of these issues by the numerous consumer complaints against it regarding the Defective Dashboard and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of GM Vehicle defects became public.

404.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the other Kansas Class members have been damaged in an amount to be proven at trial.

**K.** **Claims Brought on Behalf of the Louisiana Subclass**

**COUNT XXIV**

**VIOLATIONS OF THE LOUISIANA UNFAIR TRADE PRACTICES
AND CONSUMER PROTECTION LAW
(LA. REV. STAT. § 51:1401, ET SEQ.)
(BROUGHT ON BEHALF OF THE "LOUISIANA CLASS")**

405.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

406.   GM, Plaintiffs, and the Louisiana Class are "persons" within the meaning of the La. Rev. Stat. § 51:1402(8).

407.   Plaintiff and the Louisiana Class are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

408.   GM engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(10).

409.   The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A).   GM participated in misleading, false, or deceptive acts that violated the Louisiana CPL.

410.   In the course of GM's business, GM concealed the Defective Dashboard in GM Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Accordingly, GM engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive

acts or practices, including representing that the GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that GM Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

411.   From the date of its re-incorporation on July 10, 2009, GM knew or should have known of the Defective Dashboard inherent in GM Vehicles, both because of the knowledge of personnel retained at GM, GM service centers, and authorized GM dealerships, and continuous reports, investigations, and notifications from regulatory authorities.

412.   GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy the Defective Dashboard in all GM Vehicles. GM concealed this information as well.

413.   GM had a duty to disclose the existence of the Defective Dashboard in the GM Vehicles. By failing to disclose and by actively concealing the Defective Dashboard in GM Vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued quality and stood behind its vehicles after they were sold, GM engaged in deceptive business practices in violation of the Louisiana CPL.

414.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the quality of the GM Vehicles and GM brand, and the true value of the GM Vehicles.

415.   Plaintiffs and Louisiana Class members reasonably relied upon the Defendant's false misrepresentations and unfair or deceptive acts or practices.  They had no way of knowing that the Defendant's representations were false and gravely misleading.  As alleged herein, Defendant engaged in extremely sophisticated methods of deception.  Plaintiffs and Louisiana Class members did not, and could not, unravel the Defendant's deception on their own.

416.   GM intentionally and knowingly failed to disclose and misrepresented material facts regarding the GM Vehicles with intent to mislead Plaintiffs and the Louisiana Class.

417.   GM knew or should have known that its conduct violated the Louisiana CPL.

418. GM owed Plaintiffs and the Louisiana Class a duty to disclose the defective condition of the GM Vehicles because GM:

a. Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

b. Intentionally concealed the foregoing from Plaintiffs and the Louisiana Class; and

c. Made incomplete representations that it warranted defective components in the GM Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

419. GM's concealment of the Defective Dashboard in GM Vehicles was material to Plaintiffs and the Louisiana Class. A vehicle made by a reputable manufacturer of quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of inferior vehicles that conceals defects rather than promptly remedies them.

420.   Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased these GM Vehicles, would have paid less, and/or would not have continued to drive their unsafe vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class members' actions were justified. GM was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

421.   GM's actions as set forth above occurred in the conduct of trade or commerce.

422.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

423.   As a direct and proximate result of GM's violations of the Louisiana CPL, Plaintiffs and the Louisiana Class have suffered injury-in-fact and/or actual damage.

424.   Plaintiffs and the Louisiana Class suffered ascertainable loss caused by GM's misrepresentations and its failure to disclose material information. Had they been aware of the Defective Dashboard that existed in GM Vehicles, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased

them at all. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

425.   GM's violations present a continuing risk and disservice to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

426.   The repairs instituted by GM have not been adequate.

427.   Pursuant to La. Rev. Stat. § 51:1409, Plaintiffs and the Louisiana Class seek to recover actual damages in an amount to be determined at trial, treble damages for FCA's knowing violations of the Louisiana CPL, other monetary relief, declaratory relief, punitive damages, an order enjoining FCA's unfair, unlawful, and/or deceptive practices, and reasonable attorneys' fees and costs, and any other just and proper relief available under La. Rev. Stat. § 51:1409.

## COUNT XXV

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY/ WARRANTY AGAINST REDHIBITORY DEFECTS (LA. CIV. CODE ART. 2520, 2524) (BROUGHT ON BEHALF OF THE "LOUISIANA CLASS")

428.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

429.   Defendant is and was at all relevant times a "seller" with respect to motor vehicle sales under La. Civ. Code Art. 2520, 2524.

430.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to La. Civ. Code Art. 2520, 2524.

431.   These GM Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the GM Vehicles are inherently defective in that the dashboards are designed, manufactured, and/or installed in such a way that they will crack. This Defective Dashboard renders the GM vehicles unsafe and reduces their value.

432.   GM was provided notice of these issues by the numerous consumer complaints against it regarding the Defective Dashboard and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of GM Vehicle defects became public.

433.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the other Louisiana Class members have been damaged in an amount to be proven at trial.

L.    **Claims Brought on Behalf of the Massachusetts Subclass**

## COUNT XXVI

**VIOLATIONS OF THE MASSACHUSETTS CONSUMER PROTECTION ACT
(MASS. GEN. LAWS CH. 93A, § 1, ET SEQ.)
(BROUGHT ON BEHALF OF THE "MASSACHUSETTS CLASS")**

434.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

435.   GM and Plaintiff and the Massachusetts State Class members are "persons" within the meaning of M.G.L.A. CH. 93A, § 1(a).

436.   GM engaged in "trade" or "commerce" within the meaning of M.G.L.A. CH. 93A, § 1(b).

437.   The Massachusetts Consumer Protection Act (The Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." M.G.L.A. CH. 93A, § 2.

438.   In the course of its business, GM violated the Massachusetts Act by knowingly misrepresenting and intentionally concealing material facts regarding the durability, reliability, safety, and performance of the GM Vehicles, as detailed above.  Specifically, in marketing, offering for sale, and selling the defective GM Vehicles, GM engaged in one or more of the following unfair or deceptive acts or practices:

    a.   Representing that the GM Vehicles have characteristics or benefits that they do not have;

    b.   Representing that the GM Vehicles are of a particular standard and quality when they are not; and/or

    c.   Advertising the GM Vehicles with the intent not to sell them as advertised.

439.   GM's scheme and concealment of the true characteristics of the GM Vehicles were material to the Massachusetts State Class, and GM misrepresented, concealed, or failed to disclose the truth with the intention that Plaintiff and the Massachusetts State Class would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, Plaintiff and the Massachusetts State Class would not have purchased the GM Vehicles, or would have paid significantly less for them.

440.   Plaintiff and the Massachusetts State Class members had no way of discerning that GM's representations were false and misleading, or otherwise learning the facts that GM had concealed or failed to disclose.

441.   GM had an ongoing duty to Plaintiff and the Massachusetts State Class to refrain from unfair and deceptive practices under the Massachusetts Law in the course of its business.  Specifically, GM owed Plaintiff and the Massachusetts State Class members a duty to disclose all the material facts concerning the GM Vehicles

because it possessed exclusive knowledge, it intentionally concealed such material facts from the Massachusetts State Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

442.   Plaintiff and the Massachusetts State Class members suffered ascertainable loss and actual damages as a direct and proximate result of GM's concealment, misrepresentations, and/or failure to disclose material information.

443.   Pursuant to M.G.L.A. CH. 93A, § 9, Plaintiffs seek monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff.  Because GM's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff, up to three times actual damages, but no less than two times actual damages.

444.   GM was provided notice of the issues raised in this Count and this Complaint, as detailed above. In addition, on October 19, 2017, a notice letter was sent on behalf of Plaintiff and the Massachusetts State Class to GM pursuant to M.G.L.A. CH. 93A, § 9(3).  Because GM failed to remedy their unlawful conduct within the requisite time period, Plaintiff and the Massachusetts State Class seeks all damages and relief to which they are entitled.

## COUNT XXVII

### BREACH OF IMPLIED WARRANTIES
### (M.G.L.A. 106, §§ 2-314, 2-315)
### (BROUGHT ON BEHALF OF THE "MASSACHUSETTS CLASS")

445.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

446.   GM is and was at all relevant times a "seller" with respect to the GM Vehicles under M.G.L.A. CH. 106 § 2-103(1)(d), and a "merchant" under M.G.L.A. CH. 106 § 2-104(1).

447.   The GM Vehicles are and were at all relevant times "goods" within the meaning of M.G.L.A. CH. 106 § 2-105(1).

448.   A warranty that the GM Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to M.G.L.A. CH. 106 § 2-314.

449.   In addition, a warranty that the GM Vehicles were fit for their particular purpose is implied by law pursuant to M.G.L.A. CH. 106 § 2-315.  GM knew at the time of sale of the GM Vehicles that Plaintiff and the Massachusetts State Class intended to use the vehicles in a manner requiring a particular standard of performance and durability, and that Plaintiff and the Massachusetts State Class was relying on GM's skill and judgment to furnish suitable products for this particular purpose.

- 149

450.   The GM Vehicles, when sold and at all times thereafter, were not in merchantable condition, not fit for their ordinary purpose, and were not fit for their particular purpose as a result of their inherent defects, as detailed above. In addition, because any warranty repairs or replacements offered by GM cannot cure the defect in the GM Vehicles, they fail to cure GM's breach of implied warranties.

451.   As a direct and proximate result of GM's breach of its implied warranties, Plaintiff and the Massachusetts State Class members have been damaged in an amount to be determined at trial.

452.   GM was provided notice of the issues raised in this Count and this Complaint as detailed above.

**M.   Claims Brought on Behalf of the Michigan Subclass**

<div align="center">

**COUNT XXVIII**

**VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT**
**(MICH. COMP. LAWS § 445.903, ET SEQ.)**
**(BROUGHT ON BEHALF OF THE "MICHIGAN CLASS")**

</div>

453.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

454.   Plaintiffs and Class members are "persons" within the meaning of Mich. Comp. Laws § 445.902(1)(d).

455.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of

trade or commerce  . . . ."  Mich. Comp. Laws § 445.903(1).  FCA engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including:  "(c) Representing that goods or services have … characteristics . . . that they do not have  . . . .;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(i) Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  Mich. Comp. Laws § 445.903(1).  By failing to disclose and actively concealing that the Defective Shifter was not safe, by marketing its Class Vehicles as safe and of high quality, and by presenting itself as a reputable manufacturer that valued safety and stood behind its vehicles after they were sold, GM engaged in deceptive business practices prohibited by the Michigan CPA.

456.  In the course of its business, GM concealed the Defective Dashboards in GM Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Accordingly, GM engaged in unfair methods of

competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that GM Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

457.   From the date of its re-incorporation on July 10, 2009, GM knew or should have known of the Defective Dashboards inherent of GM Vehicles, both because of the knowledge of personnel retained at GM, GM service centers and authorized GM dealerships, and continuous reports, investigations, and notifications from regulatory authorities.

458.   GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed

and manufactured and the failure to disclose and remedy the Defective Dashboards in all GM Vehicles. GM concealed this information as well.

459.   GM had a duty to disclose the existence of the Defective Dashboards in the GM Vehicles. By failing to disclose and by actively concealing the Defective Dashboards in GM Vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued quality and stood behind its vehicles after they were sold, GM engaged in deceptive business practices in violation of the Michigan CPA.

460.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the quality of the GM Vehicles and GM brand, and the true value of the GM Vehicles.

461.   Plaintiffs and Michigan Class members reasonably relied upon the Defendant's false misrepresentations and unfair or deceptive acts or practices.  They had no way of knowing that the Defendant's representations were false and gravely misleading.   As alleged herein, Defendant engaged in extremely sophisticated methods of deception.  Plaintiffs and Indiana Class members did not, and could not, unravel the Defendant's deception on their own.

462.   GM intentionally and knowingly failed to disclose and misrepresented material facts regarding the GM Vehicles with intent to mislead Plaintiffs and the Michigan Class.

463.   GM knew or should have known that its conduct violated the Michigan CPA.

464.   GM owed Plaintiffs and the Michigan Class a duty to disclose the defective condition of the GM Vehicles because GM:

    a.   Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured; and

    b.   .Intentionally concealed the foregoing from Plaintiffs and the Michigan Class.

    c.   Made incomplete representations that it warranted defective components in the GM Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

465.   GM's concealment of the Defective Dashboards in GM Vehicles was material to Plaintiffs and the Michigan Class. A vehicle made by a reputable manufacturer of quality vehicles is worth more than an otherwise comparable

vehicle made by a disreputable manufacturer of inferior vehicles that conceals defects rather than promptly remedies them.

466.   Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased these GM Vehicles, would have paid less, and/or would not have continued to drive their unsafe vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class members' actions were justified. GM was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

467.   GM's actions as set forth above occurred in the conduct of trade or commerce.

468.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

469.   As a direct and proximate result of GM's violations of the Michigan CPA, Plaintiffs and the Michigan Class have suffered injury-in-fact and/or actual damage.

470.   Plaintiffs and the Michigan Class suffered ascertainable loss caused by GM's misrepresentations and its failure to disclose material information. Had they been aware of the Defective Dashboards that existed in GM Vehicles, Plaintiffs

either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

471.   GM's violations present a continuing risk and disservice to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

472.   The repairs instituted by GM have not been adequate.

473.   As a direct and proximate result of GM's violations of the Michigan CPA, Plaintiffs and the Michigan Class have suffered injury-in-fact and/or actual damage.

474.   Plaintiff seeks injunctive relief to enjoin GM from continuing its unfair, unlawful, and/or deceptive practices; monetary relief against GM measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiff and each Michigan Class member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

475.   Plaintiffs also seek punitive damages against GM because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others.  GM intentionally and willfully misrepresented the safety and reliability of the GM Vehicles, concealed material facts that only they knew, and repeatedly

promised Plaintiffs and Michigan Class Members that all vehicles were safe—all to avoid the expense and public relations nightmare of correcting a noxious flaw in the Class Vehicles.  FCA's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT XXIX

### BREACH OF IMPLIED WARRANTIES
### (MICH. COMP. LAWS § 440.2314, § 440.2315)
### (BROUGHT ON BEHALF OF THE "MICHIGAN CLASS")

476.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

477.   GM is and was at all relevant times a merchant with respect to motor vehicles within the meaning of Mich. Comp. Laws § 440.2314(1).

478.   Under Mich. Comp. Laws § 440.2314, a warranty that the GM Vehicles were in merchantable condition was implied by law in the transactions when Plaintiff purchased or leased the GM Vehicles.

479.   These GM Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the GM Vehicles are inherently defective in that the dashboards are designed, manufactured, and/or installed in such a way that they will crack. These Defective Dashboards render the GM vehicles unsafe and reduces their value.

480.   GM was provided notice of these issues by the numerous consumer complaints against it regarding the Defective Dashboards and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of GM Vehicle defects became public.

481.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the other Michigan Class members have been damaged in an amount to be proven at trial.

**N.     Claims Brought on Behalf of the Minnesota Subclass**

**COUNT XXX**

**VIOLATION OF MINNESOTA PREVENTION OF CONSUMER FRAUD ACT
(MINN. STAT. § 325F.68, ET SEQ.)
(BROUGHT ON BEHALF OF THE "MINNESOTA CLASS")**

482.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

483.   GM and the Minnesota State Class members are "persons" within the meaning of MINN. STAT. § 325F.69. The GM Vehicles are "merchandise" within the meaning of MINN. STAT. § 325F.69.

484.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with

the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." MINN. STAT. § 325F.69(1).

485.   In the course of its business, GM violated the Minnesota CFA by knowingly misrepresenting and intentionally concealing material facts regarding the durability, reliability, safety, and performance of the GM Vehicles, as detailed above.  Specifically, in marketing, offering for sale, and selling the defective GM Vehicles, GM engaged in one or more of the following unfair or deceptive acts or practices prohibited by the Minnesota CFA:

> a.   Representing that the GM Vehicles have characteristics or benefits that they do not have;
>
> b.   Representing that the GM Vehicles are of a particular standard and quality when they are not; and/or
>
> c.   Advertising the GM Vehicles with the intent not to sell them as advertised.

486.   GM's scheme and concealment of the true characteristics of the GM Vehicles were material to the Minnesota State Class, and GM misrepresented, concealed, or failed to disclose the truth with the intention that the Minnesota State Class would rely on the misrepresentations, concealments, and omissions. Had they

known the truth, the Minnesota State Class would not have purchased the GM Vehicles, or would have paid significantly less for them.

487. The Minnesota State Class members had no way of discerning that GM's representations were false and misleading, or otherwise learning the facts that GM had concealed or failed to disclose.

488. GM had an ongoing duty to the Minnesota State Class to refrain from unfair and deceptive practices under the Minnesota CFA In the course of its business. Specifically, GM owed the Minnesota State Class members a duty to disclose all the material facts concerning the GM Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the Minnesota State Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

489. The Minnesota State Class members suffered ascertainable loss and actual damages as a direct and proximate result of GM's concealment, misrepresentations, and/or failure to disclose material information.

490. Pursuant to the Minnesota CFA, and MINN. STAT. § 8.31(3a), the Minnesota State Class seeks an order awarding damages, treble damages, and any other just and proper relief available under the Minnesota CFA

## COUNT XXXI

### VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT
### (MINN. STAT. § 325D.43-48, ET SEQ.)
### (BROUGHT ON BEHALF OF THE "MINNESOTA CLASS")

491.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

492.   GM and the Minnesota State Class members are "persons" within the meaning of MINN. STAT. § 325D.44. The GM Vehicles are "goods" within the meaning of MINN. STAT. § 325D.44.

493.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised." MINN. STAT. § 325D.44.

494.   In the course of its business, GM violated the Minnesota DTPA by knowingly misrepresenting and intentionally concealing material facts regarding the durability, reliability, safety, and performance of the GM Vehicles, as detailed

above.  Specifically, in marketing, offering for sale, and selling the defective GM

Vehicles, GM engaged in one or more of the following unfair or deceptive acts or

practices as defined in MINN. STAT. § 325D.44:

> a. Representing that the GM Vehicles have characteristics and benefits
>    that they do not have;
>
> b. Representing that the GM Vehicles are of a particular standard and
>    quality  when they are not; and/or
>
> c. Advertising the GM Vehicles with the intent not to sell them as
>    advertised.

495.  GM's scheme and concealment of the true characteristics of the GM

Vehicles were material to the Minnesota State Class, and GM misrepresented,

concealed, or failed to disclose the truth with the intention that the Minnesota State

Class would rely on the misrepresentations, concealments, and omissions.  Had they

known the truth, the Minnesota State Class would not have purchased the GM

Vehicles, or would have paid significantly less for them.

496.  The Minnesota State Class members had no way of discerning that

GM's representations were false and misleading, or otherwise learning the facts that

GM had concealed or failed to disclose.

497.  GM had an ongoing duty to the Minnesota State Class to refrain from

unfair and deceptive practices under the Minnesota DTPA In the course of its

business.   Specifically, GM owed the Minnesota State Class members a duty to disclose all the material facts concerning the GM Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the Minnesota State Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

498.   The Minnesota State Class members suffered ascertainable loss and actual damages as a direct and proximate result of GM's concealment, misrepresentations, and/or failure to disclose material information.

499.   Pursuant to MINN. STAT. § 8.31(3a) and 325D.45, Plaintiffs seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.

## COUNT XXXII

### BREACH OF IMPLIED WARRANTIES
### (MINN. STAT. §§ 336.2-314, 336.2-315)
### (BROUGHT ON BEHALF OF THE "MINNESOTA CLASS")

500.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

501.   GM is and was at all relevant times a "merchant" with respect to the GM Vehicles under MINN. STAT. § 336.2-104, and a "seller" of the GM Vehicles under MINN. STAT. § 336.2-103(1)(d).

502.   The GM Vehicles are and were at all relevant times "goods" within the meaning of MINN. STAT. § 336.2-105(1).

503.   A warranty that the GM Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to MINN. STAT. § 336.2-314.

504.   In addition, a warranty that the GM Vehicles were fit for their particular purpose is implied by law pursuant to MINN. STAT. § 336.2-315. GM knew at the time of sale of the GM Vehicles that the Minnesota State Class intended to use the vehicles in a manner requiring a particular standard of performance and durability, and that the Minnesota State Class was relying on GM's skill and judgment to furnish suitable products for this particular purpose.

505.   The GM Vehicles, when sold and at all times thereafter, were not in merchantable condition, not fit for their ordinary purpose, and were not fit for their particular purpose as a result of their inherent defects, as detailed above. In addition, because any warranty repairs or replacements offered by GM cannot cure the defect in the GM Vehicles, they fail to cure GM's breach of implied warranties.

506.   As a direct and proximate result of GM's breach of its implied warranties, the Minnesota State Class members have been damaged in an amount to be determined at trial.

507.   GM was provided notice of the issues raised in this Count and this Complaint as detailed above.

**O.   Claims Brought on Behalf of the Missouri Subclass**

<div align="center">

**COUNT XXXIII**

**VIOLATION OF MISSOURI MERCHANDISING PRACTICES ACT**
**(MO. REV. STAT. § 407.010, ET SEQ.)**
**(BROUGHT ON BEHALF OF THE "MISSOURI CLASS")**

</div>

508.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

509.   GM and the Missouri State Class members are "persons" within the meaning of MO. REV. STAT. § 407.020.

510.   The GM Vehicles are "merchandise" within the meaning of MO. REV. STAT. § 407.010(4).

511.   GM is engaged in "trade" or "commerce" within the meaning of MO. REV. STAT. § 407.010(7).

512.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." MO. REV. STAT. § 407.020.

513.    In the course of its business, GM violated the Missouri MPA by knowingly misrepresenting and intentionally concealing material facts regarding the durability, reliability, safety, and performance of the GM Vehicles, as detailed above.  Specifically, in marketing, offering for sale, and selling the defective GM Vehicles, GM engaged in one or more of the following unfair or deceptive acts or practices proscribed by the Missouri MPA:

      a.  Representing that the GM Vehicles have characteristics or benefits that they do not have;

      b.  Representing that the GM Vehicles are of a particular standard and quality when they are not; and/or

      c.  Advertising the GM Vehicles with the intent not to sell them as advertised.

514.    GM's scheme and concealment of the true characteristics of the GM Vehicles were material to the Missouri State Class, and GM misrepresented, concealed, or failed to disclose the truth with the intention that the Missouri State Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, the Missouri State Class would not have purchased the GM Vehicles, or would have paid significantly less for them.

515.   The Missouri State Class members had no way of discerning that GM's representations were false and misleading, or otherwise learning the facts that GM had concealed or failed to disclose.

516.   GM had an ongoing duty to the Missouri State Class to refrain from unfair and deceptive practices under the Missouri MPA In the course of its business. Specifically, GM owed the Missouri State Class members a duty to disclose all the material facts concerning the GM Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the Missouri State Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

517.   The Missouri State Class members suffered ascertainable loss and actual damages as a direct and proximate result of GM's concealment, misrepresentations, and/or failure to disclose material information.

518.   GM is liable to Plaintiffs for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, and any other just and proper relief under MO. REV. STAT. § 407.025.

## COUNT XXXIV

## BREACH OF IMPLIED WARRANTIES
### (MO. REV. STAT. §§ 400.2-314, 400.2-315)
### (BROUGHT ON BEHALF OF THE "MISSOURI CLASS")

519.  Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth here.

520.  GM is and was at all relevant times a "merchant" with respect to the GM Vehicles under MO. REV. STAT. § 400.2-104(1), and a "seller" of the GM Vehicles under MO. REV. STAT. § 400.2-103(1)(d).

521.  The GM Vehicles are and were at all relevant times "goods" within the meaning of MO. REV. STAT. § 400.2-105(1).

522.  A warranty that the GM Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to MO. REV. STAT. § 400.2-314.

523.  In addition, a warranty that the GM Vehicles were fit for their particular purpose is implied by law pursuant to MO. REV. STAT. § 400.2-315. GM knew at the time of sale of the GM Vehicles that the Missouri State Class intended to use the vehicles in a manner requiring a particular standard of performance and durability, and that the Missouri State Class was relying on GM's skill and judgment to furnish suitable products for this particular purpose.

524.   The GM Vehicles, when sold and at all times thereafter, were not in merchantable condition, not fit for their ordinary purpose, and were not fit for their particular purpose as a result of their inherent defects, as detailed above. In addition, because any warranty repairs or replacements offered by GM cannot cure the defect in the GM Vehicles, they fail to cure GM's breach of implied warranties.

525.   As a direct and proximate result of GM's breach of its implied warranties, the Missouri State Class members have been damaged in an amount to be determined at trial.

526.   GM was provided notice of the issues raised in this Count and this Complaint as detailed above.

**P.    Claims Brought on Behalf of the New Jersey Subclass**

<div align="center">

**COUNT XXXVII**

**VIOLATION OF NEW JERSEY CONSUMER FRAUD ACT**
**(N.J. STAT. ANN. § 56:8-1, ET SEQ.)**
**(BROUGHT ON BEHALF OF THE "NEW JERSEY CLASS")**

</div>

527.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

528.   GM and the New Jersey State Class members are "persons" within the meaning of N.J. STAT. ANN. § 56:8-1(d). GM engaged in "sales" of "merchandise" within the meaning of N.J. STAT. ANN. § 56:8-1(c), (d).

529.   The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. STAT. ANN. § 56:8-2.

530.   In the course of its business, GM violated the New Jersey CFA by knowingly misrepresenting and intentionally concealing material facts regarding the durability, reliability, safety, and performance of the GM Vehicles, as detailed above.  Specifically, in marketing, offering for sale, and selling the defective GM Vehicles, GM engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the New Jersey CFA:

> a.  Representing that the GM Vehicles have characteristics or benefits that they do not have;
>
> b.  Representing that the GM Vehicles are of a particular standard and quality when they are not; and/or

- 170

c. Advertising the GM Vehicles with the intent not to sell them as advertised.

531.   GM's scheme and concealment of the true characteristics of the GM Vehicles were material to the New Jersey State Class, and GM misrepresented, concealed, or failed to disclose the truth with the intention that the New Jersey State Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, the New Jersey State Class would not have purchased the GM Vehicles, or would have paid significantly less for them.

532.   The New Jersey State Class members had no way of discerning that GM's representations were false and misleading, or otherwise learning the facts that GM had concealed or failed to disclose.

533.   GM had an ongoing duty to the New Jersey State Class to refrain from unfair and deceptive practices under the New Jersey CFA In the course of its business.  Specifically, GM owed the New Jersey State Class members a duty to disclose all the material facts concerning the GM Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the New Jersey State Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

- 171

534.   The New Jersey State Class members suffered ascertainable loss and actual damages as a direct and proximate result of GM's concealment, misrepresentations, and/or failure to disclose material information.

535.   Pursuant to N.J. STAT. ANN. § 56:8-19, the New Jersey State Class seeks an order awarding damages, treble damages, and any other just and proper relief available under the New Jersey CFA.

## COUNT XXXVIII

### BREACH OF IMPLIED WARRANTIES
### (N.J. STAT. ANN. §§ 12A:2-314, 12A:2-315)
### (BROUGHT ON BEHALF OF THE "NEW JERSEY CLASS")

536.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

537.   GM is and was at all relevant times a "merchant" with respect to the GM Vehicles under N.J. STAT. ANN. § 12A:2-104(1), and a "seller" of the GM Vehicles under N.J. STAT. ANN. § 12A:2-103(1)(d).

538.   The GM Vehicles are and were at all relevant times "goods" within the meaning of N.J. STAT. ANN. § 12A:2-105(1).

539.   A warranty that the GM Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to N.J. STAT. ANN. § 12A:2-314. 1175. In addition, a warranty that the GM Vehicles were fit for their particular purpose is implied by law pursuant to N.J. STAT. ANN. § 12A:2-315.

GM knew at the time of sale of the GM Vehicles that the New Jersey State Class intended to use the vehicles in a manner requiring a particular standard of performance and durability, and that the New Jersey State Class was relying on GM's skill and judgment to furnish suitable products for this particular purpose.

540.   The GM Vehicles, when sold and at all times thereafter, were not in merchantable condition, not fit for their ordinary purpose, and were not fit for their particular purpose as a result of their inherent defects, as detailed above. In addition, because any warranty repairs or replacements offered by GM cannot cure the defect in the GM Vehicles, they fail to cure GM's breach of implied warranties.

541.   As a direct and proximate result of GM's breach of its implied warranties, the New Jersey State Class members have been damaged in an amount to be determined at trial.

542.   GM was provided notice of the issues raised in this Count and this Complaint as detailed above.

**Q.    Claims Brought on Behalf of the New Mexico Subclass**

**COUNT XXXIX**

**VIOLATIONS OF THE NEW MEXICO UNFAIR
TRADE PRACTICES ACT
(N.M. STAT. ANN. § 57-12-1 ET SEQ.)
(BROUGHT ON BEHALF OF THE "NEW MEXICO CLASS")**

543.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

544.   Defendant, Plaintiffs, and New Mexico Class members are or were "person[s]" under the New Mexico Unfair Trade Practices Act ("New Mexico UTPA"), N.M. Stat. Ann. § 57-12-2. 010549-11 816608 V1

545.   GM's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.M. Stat. Ann. § 57-12-2.

546.   The New Mexico UTPA makes unlawful "a false or misleading oral or written statement, visual description or other representation of any kind knowingly made in connection with the sale, lease, rental or loan of goods or services … by a person in the regular course of the person's trade or commerce, that may, tends to or does deceive or mislead any person," including but not limited to "failing to state a material fact if doing so deceives or tends to deceive." N.M. Stat. Ann. § 57-12-2(D). GM's acts and omissions described herein constitute unfair or deceptive acts or practices under N.M. Stat. Ann. § 57-12-2(D).   In addition, GM's actions constitute unconscionable actions under N.M. Stat. Ann. § 57-12-2(E), since they took advantage of the lack of knowledge, ability, experience, and capacity of the New Mexico Class members to a grossly unfair degree.

547.   In the course of GM's business, GM concealed the Defective Dashboard in GM Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Accordingly, GM engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive

acts or practices, including representing that the GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that GM Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

548.   From the date of its re-incorporation on July 10, 2009, GM knew or should have known of the Defective Dashboard inherent in GM Vehicles, both because of the knowledge of personnel retained at GM, GM service centers, and authorized GM dealerships, and continuous reports, investigations, and notifications from regulatory authorities.

549.   GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy the Defective Dashboard in all GM Vehicles. GM concealed this information as well.

550.   GM had a duty to disclose the existence of the Defective Dashboard in the GM Vehicles. By failing to disclose and by actively concealing the Defective Dashboard in GM Vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued quality and stood behind its vehicles after they were sold, GM engaged in deceptive business practices in violation of the New Mexico UTPA.

551.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the quality of the GM Vehicles and GM brand, and the true value of the GM Vehicles.

552.   Plaintiffs and New Mexico Class members reasonably relied upon the Defendant's false misrepresentations and unfair or deceptive acts or practices.  They had no way of knowing that the Defendant's representations were false and gravely misleading.   As alleged herein, Defendant engaged in extremely sophisticated methods of deception.   Plaintiffs and New Mexico Class members did not, and could not, unravel the Defendant's deception on their own.

553.   GM intentionally and knowingly failed to disclose and misrepresented material facts regarding the GM Vehicles with intent to mislead Plaintiffs and the New Mexico Class.

554.   GM knew or should have known that its conduct violated the New Mexico UTPA.

- 176

555.   GM owed Plaintiffs and the New Mexico Class a duty to disclose the defective condition of the GM Vehicles because GM:

    a.   Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

    b.   Intentionally concealed the foregoing from Plaintiffs and the New Mexico Class; and

    c.   Made incomplete representations that it warranted defective components in the GM Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

556.   GM's concealment of the Defective Dashboard in GM Vehicles was material to Plaintiffs and the New Mexico Class. A vehicle made by a reputable manufacturer of quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of inferior vehicles that conceals defects rather than promptly remedies them.

557.   Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased these GM Vehicles, would have paid less, and/or would not have continued to drive their unsafe vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class members' actions were justified. GM was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

558.   GM's actions as set forth above occurred in the conduct of trade or commerce.

559.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

560.   As a direct and proximate result of GM's violations of the New Mexico UTPA, Plaintiffs and the New Mexico Class have suffered injury-in-fact and/or actual damage.

561.   Plaintiffs and the New Mexico Class suffered ascertainable loss caused by GM's misrepresentations and its failure to disclose material information. Had they been aware of the Defective Dashboard that existed in GM Vehicles, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased

them at all. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

562.   GM's violations present a continuing risk and disservice to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

563.   The repairs instituted by GM have not been adequate.

564.   Pursuant to N.M. Stat. Ann. § 57-12-10, Plaintiffs and the New Mexico Class seek monetary relief against GM for actual damages or $100, whichever is greater, in addition to treble damages.

565.   Plaintiffs and the New Mexico Class also seek declaratory relief, punitive damages, an order enjoining GM's unfair, unlawful, and/or deceptive practices, and reasonable attorneys' fees and costs, as well as other proper and just relief under the New Mexico UTPA.

## COUNT XL

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.M. STAT. §§ 55-2-314 AND 55-2A-212)
### (BROUGHT ON BEHALF OF THE "NEW MEXICO CLASS")

566.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

567.   GM is and was at all relevant times a "merchant" with respect to motor vehicle sales under N.M. Stat. § 55-2-104(1) and a "seller" of motor vehicles under § 55-2-103(1)(d).

568.   With respect to leases, Defendant is and was at all relevant times a "lessor" of motor vehicles under N.M. Stat. § 55-2A-103(1)(p).

569.   The GM Vehicles are and were at all relevant times "goods" within the meaning of N.M. Stat. §§ 55-2-105(1) and 55-2A-103(1)(h).

570.   A warranty that the GM Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.M. Stat. §§ 55-2-314 and 55-2A-212.

571.   These GM Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the GM Vehicles are inherently defective in that the dashboards are designed, manufactured, and/or installed in such a way that they will crack. This Defective Dashboard renders the GM vehicles unsafe and reduces their value.

572.   GM was provided notice of these issues by the numerous consumer complaints against it regarding the Defective Dashboard and by numerous individual letters and communications sent by Plaintiffs and others within a

reasonable amount of time after the allegations of GM Vehicle defects became public.

573. As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the other New Mexico Class members have been damaged in an amount to be proven at trial.

### R.   Claims Brought on Behalf of the North Carolina Subclass

### COUNT XLI

### VIOLATION OF NORTH CAROLINA'S UNFAIR AND DECEPTIVE ACTS AND PRACTICES ACT (N.C. GEN. STAT. § 75-1.1, ET SEQ.) (BROUGHT ON BEHALF OF THE "NORTH CAROLINA CLASS")

574. Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

575. North Carolina's Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, et seq. ("NCUDTPA"), prohibits a person from engaging in "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]"  The North Carolina UDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the North Carolina UDTPA.  N.C. Gen. Stat. § 75-16.

576.   GM's acts and practices complained of herein were performed in the course of GM's trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. § 75-1.1(b).

577.   In the course of GM's business, GM concealed the Defective Dashboards in GM Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Accordingly, GM engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that GM Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

578.   From the date of its re-incorporation on July 10, 2009, GM knew or should have known of the Defective Dashboards inherent in GM Vehicles, both because of the knowledge of personnel retained at GM, GM service centers, and

authorized GM dealerships, and continuous reports, investigations, and notifications from regulatory authorities.

579.  GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy the Defective Dashboards in all GM Vehicles. GM concealed this information as well.

580.  GM had a duty to disclose the existence of the Defective Dashboards in the GM Vehicles. By failing to disclose and by actively concealing the Defective Dashboards in GM Vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued quality and stood behind its vehicles after they were sold, GM engaged in deceptive business practices in violation of the North Carolina UDTPA.

581.  GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the quality of the GM Vehicles and GM brand, and the true value of the GM Vehicles.

582.  Plaintiffs and North Carolina Class members reasonably relied upon the Defendant's false misrepresentations and unfair or deceptive acts or practices. They had no way of knowing that the Defendant's representations were false and

gravely misleading.    As alleged herein, Defendant engaged in extremely sophisticated methods of deception.  Plaintiffs and North Carolina Class members did not, and could not, unravel the Defendant's deception on their own.

583.   GM intentionally and knowingly failed to disclose and misrepresented material facts regarding the GM Vehicles with intent to mislead Plaintiffs and the North Carolina Class.

584.   GM knew or should have known that its conduct violated the North Carolina UDTPA.

585.   GM owed Plaintiffs and the North Carolina Class a duty to disclose the defective condition of the GM Vehicles because GM:

   a. Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;

   b. Intentionally concealed the foregoing from Plaintiffs and the North Carolina Class; and

   c. Made incomplete representations that it warranted defective components in the GM Vehicles, while purposefully withholding

material facts from Plaintiffs and the Class that contradicted these representations.

586. GM's concealment of the Defective Dashboards in GM Vehicles was material to Plaintiffs and the North Carolina Class. A vehicle made by a reputable manufacturer of quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of inferior vehicles that conceals defects rather than promptly remedies them.

587. Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased these GM Vehicles, would have paid less, and/or would not have continued to drive their unsafe vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class members' actions were justified. GM was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

588. GM's actions as set forth above occurred in the conduct of trade or commerce.

589. GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

590.   As a direct and proximate result of GM's violations of the North Carolina UDTPA, Plaintiffs and the North Carolina Class have suffered injury-in-fact and/or actual damage.

591.   Plaintiffs and the North Carolina Class suffered ascertainable loss caused by GM's misrepresentations and its failure to disclose material information. Had they been aware of the Defective Dashboards that existed in GM Vehicles, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

592.   GM's violations present a continuing risk and disservice to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

593.   The repairs instituted by GM have not been adequate.

594.   1Plaintiffs and the North Carolina Class seek monetary relief against GM for actual damages, in addition to treble damages pursuant to N.C. Gen. Stat. § 75-16.

595.   Plaintiffs and the North Carolina Class also seek declaratory relief, punitive damages, an order enjoining GM's unfair, unlawful, and/or deceptive practices, and reasonable attorneys' fees and costs pursuant to N.C. Gen. Stat. § 75-16.1, as well as other proper and just relief under the North Carolina UDTPA.

- 186

## COUNT XLII

### BREACH OF IMPLIED WARRANTIES
### (N.C. GEN. STAT. §§ 25-2-314, 25-2-315)
### (BROUGHT ON BEHALF OF THE "NORTH CAROLINA CLASS")

596.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

597.   GM is and was at all relevant times a merchant with respect to motor vehicles.

598.   A warranty that the GM Vehicles were in merchantable condition is implied by law in the instant transactions.

599.   These GM Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the GM Vehicles are inherently defective in that the dashboards are designed, manufactured, and/or installed in such a way that they will crack. These Defective Dashboards render the GM vehicles unsafe and reduces their value.

600.   GM was provided notice of these issues by the numerous consumer complaints against it regarding the Defective Dashboards and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of GM Vehicle defects became public.

- 187

601.  As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the other North Carolina Class members have been damaged in an amount to be proven at trial.

**S.      Claims Brought on Behalf of the Ohio Subclass**

**COUNT XLIII**

**VIOLATION OF THE CONSUMER SALES PRACTICES ACT**
**(OHIO REV. CODE § 1345.01, ET SEQ.)**
**(BROUGHT ON BEHALF OF THE "OHIO CLASS")**

602.  Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

603.  Plaintiffs and the other Ohio Class members are "consumers" as defined by the Ohio Consumer Sales Practices Act, Ohio Rev. Code § 1345.01 ("OCSPA").  GM is a "supplier" as defined by the OCSPA.  Plaintiffs' and the other Ohio Class members' purchases or leases of the GM Vehicles were "consumer transactions" as defined by the OCSPA.

604.  By willfully failing to disclose and actively concealing the Defective Dashboards, GM engaged in deceptive business practices prohibited by the OCSPA, including (1) representing that the GM Vehicles have characteristics, uses, benefits, and qualities which they do not have, (2) representing that the GM Vehicles are of a particular standard, quality, and grade when they are not, (3) advertising the GM Vehicles with the intent not to sell them as advertised, and (4) engaging in acts or

practices which are otherwise unfair, misleading, false, or deceptive to the consumer.

605.  In the course of GM's business, GM concealed the Defective Dashboards in GM Vehicles as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Accordingly, GM engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, including representing that the GM Vehicles have characteristics, uses, benefits, and qualities which they do not have; representing that GM Vehicles are of a particular standard and quality when they are not; failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer; making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is; and failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

606.  From the date of its re-incorporation on July 10, 2009, GM knew or should have known of the Defective Dashboards inherent in GM Vehicles, both because of the knowledge of personnel retained at GM, GM service centers, and authorized GM dealerships, and continuous reports, investigations, and notifications from regulatory authorities.

607. GM was also aware that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured and the failure to disclose and remedy the Defective Dashboards in all GM Vehicles. GM concealed this information as well.

608. GM had a duty to disclose the existence of the Defective Dashboards in the GM Vehicles. By failing to disclose and by actively concealing the Defective Dashboards in GM Vehicles, by marketing its vehicles as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that valued quality and stood behind its vehicles after they were sold, GM engaged in deceptive business practices in violation of the OCSPA.

609. GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the quality of the GM Vehicles and GM brand, and the true value of the GM Vehicles.

610. Plaintiffs and Ohio Class members reasonably relied upon the Defendant's false misrepresentations and unfair or deceptive acts or practices. They had no way of knowing that the Defendant's representations were false and gravely misleading. As alleged herein, Defendant engaged in extremely sophisticated

methods of deception.  Plaintiffs and Ohio Class members did not, and could not, unravel the Defendant's deception on their own.

611.   GM intentionally and knowingly failed to disclose and misrepresented material facts regarding the GM Vehicles with intent to mislead Plaintiffs and the Ohio Class.

612.   GM knew or should have known that its conduct violated OCSPA.

613.   GM owed Plaintiffs and the Ohio Class a duty to disclose the defective condition of the GM Vehicles because GM:

> a.  Possessed exclusive knowledge that it valued cost-cutting over safety, selected parts from the cheapest supplier regardless of quality, and actively discouraged employees from finding and flagging known safety defects, and that this approach would necessarily cause the existence of more defects in the vehicles it designed and manufactured;
>
> b.  Intentionally concealed the foregoing from Plaintiffs and the Ohio Class; and
>
> c.  Made incomplete representations that it warranted defective components in the GM Vehicles, while purposefully withholding material facts from Plaintiffs and the Class that contradicted these representations.

614.   GM's concealment of the Defective Dashboards in GM Vehicles was material to Plaintiffs and the Ohio Class. A vehicle made by a reputable manufacturer of quality vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of inferior vehicles that conceals defects rather than promptly remedies them.

615.   Plaintiffs and Class members were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased these GM Vehicles, would have paid less, and/or would not have continued to drive their unsafe vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' and Class members' actions were justified. GM was in exclusive control of the material facts, and such facts were not generally known to the public, Plaintiffs, or Class members.

616.   GM's actions as set forth above occurred in the conduct of trade or commerce.

617.   GM's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers.

618.   The Ohio Attorney General has made available for public inspection prior state court decisions which have held that the acts and omissions of GM in this Complaint, including, but not limited to, the failure to honor implied warranties, the

making and distribution of false, deceptive, and/or misleading representations, and the concealment and/or non-disclosure of a dangerous defect, constitute deceptive sales practices in violation of the OCSPA.  These cases include, but are not limited to, the following:

a. *Mason v. Mercedes Benz USA, LLC* (OPIF #10002382);

b. *State ex rel. Betty D. Montgomery v. Volkswagen Motor Co.* (OPIF #10002123);

c. *State ex rel. Betty D. Montgomery v. Bridgestone/Firestone, Inc.* (OPIF #10002025);

d. *Bellinger v. Hewlett-Packard Co.*, No. 20744, 2002 Ohio App. LEXIS 1573 (Ohio Ct. App. Apr. 10, 2002) (OPIF #10002077);

e. *Borror v. MarineMax of Ohio*, No. OT-06-010, 2007 Ohio App. LEXIS 525 (Ohio Ct. App. Feb. 9, 2007) (OPIF #10002388);

f. *State ex rel. Jim Petro v. Craftmatic Organization, Inc.* (OPIF #10002347);

g. *Mark J. Craw Volkswagen, et al. v. Joseph Airport Toyota, Inc.* (OPIF #10001586);

h. *State ex rel. William J. Brown v. Harold Lyons, et al.* (OPIF #10000304);

i. *Brinkman v. Mazda Motor of America, Inc.* (OPIF #10001427);

j.  *Khouri v. Don Lewis* (OPIF #100001995);

k.  *Mosley    v.    Performance    Mitsubishi    aka    Automanage*  (OPIF #10001326);

l.  *Walls v. Harry Williams dba Butch's Auto Sales* (OPIF #10001524); and

m. *Brown v. Spears* (OPIF #10000403).

619.  As a direct and proximate result of GM's violations of the OCSPA, Plaintiffs and the Ohio Class have suffered injury-in-fact and/or actual damage.

620.  Plaintiffs and the Ohio Class suffered ascertainable loss caused by GM's misrepresentations and its failure to disclose material information. Had they been aware of the Defective Dashboards that existed in GM Vehicles, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of GM's misconduct.

621.  GM's violations present a continuing risk and disservice to Plaintiffs as well as to the general public. GM's unlawful acts and practices complained of herein affect the public interest.

622.  The repairs instituted by GM have not been adequate.

623.  Plaintiffs and the Ohio Class seek monetary relief against GM for actual damages, in addition to treble damages.

624.   Plaintiffs and the Ohio Class also seek declaratory relief, punitive damages, an order enjoining GM's unfair, unlawful, and/or deceptive practices, and reasonable attorneys' fees and costs pursuant to Ohio Rev. Code § 1345.09, as well as other proper and just relief under the OCSPA.

<div align="center">

**COUNT XLIV**

**BREACH OF IMPLIED WARRANTIES**
**(OHIO REV. CODE ANN. §§ 1302.27, 1302.28)**
**(BROUGHT ON BEHALF OF THE "OHIO CLASS")**

</div>

625.   Plaintiffs reallege and incorporate by reference all paragraphs as though fully set forth herein.

626.   GM is and was at all relevant times a merchant with respect to motor vehicles.

627.   A warranty that the GM Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law.

628.   These GM Vehicles, when sold or leased and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which vehicles are used. Specifically, the GM Vehicles are inherently defective in that the dashboards are designed, manufactured, and/or installed in such a way that they will crack. These Defective Dashboards render the GM vehicles unsafe and reduces their value.

629.   GM was provided notice of these issues by the numerous consumer complaints against it regarding the Defective Dashboards and by numerous individual letters and communications sent by Plaintiffs and others within a reasonable amount of time after the allegations of GM Vehicle defects became public.

630.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Plaintiffs and the other Ohio Class members have been damaged in an amount to be proven at trial.

### T.   Claims Brought on Behalf of the Pennsylvania Subclass

### COUNT XLV

### VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (73 P.S. § 201-1, ET SEQ.) (BROUGHT ON BEHALF OF THE "PENNSYLVANIA CLASS")

631.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

632.   Plaintiffs and GM are "persons" within the meaning of 73 P.S. § 201-2(2).  Plaintiffs purchased GM Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

633.   All of the acts complained of herein were perpetrated by GM in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

634.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …. Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;:" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

635.   In the course of its business, GM violated the Pennsylvania CPL by knowingly misrepresenting and intentionally concealing material facts regarding the durability, reliability, safety, and performance of the GM Vehicles, as detailed above.  Specifically, in marketing, offering for sale, and selling the defective GM Vehicles, GM engaged in one or more of the following unfair or deceptive acts or practices which are proscribed by the Pennsylvania CPL:

    a.   Representing that the GM Vehicles have characteristics or benefits that they do not have;

    b.   Representing that the GM Vehicles are of a particular standard and quality when they are not; and/or

    c.   Advertising the GM Vehicles with the intent not to sell them as advertised.

636.   GM's scheme and concealment of the true characteristics of the GM Vehicles were material to the Pennsylvania State Class, and GM misrepresented, concealed, or failed to disclose the truth with the intention that the Pennsylvania State Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, the Pennsylvania State Class would not have purchased the GM Vehicles, or would have paid significantly less for them.

637.   The Pennsylvania State Class members had no way of discerning that GM's representations were false and misleading, or otherwise learning the facts that GM had concealed or failed to disclose.

638.   GM had an ongoing duty to the Pennsylvania State Class to refrain from unfair and deceptive practices under the Pennsylvania CPL In the course of its business.  Specifically, GM owed the Pennsylvania State Class members a duty to disclose all the material facts concerning the GM Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the Pennsylvania State Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

639.   The Pennsylvania State Class members suffered ascertainable loss and actual damages as a direct and proximate result of GM's concealment, misrepresentations, and/or failure to disclose material information.

640.   Pursuant to 73 P.S. § 201-9.2(a), the Pennsylvania State Class seeks an order awarding damages, treble damages, and any other just and proper relief available under the Pennsylvania CPL.

## COUNT XLVI

## BREACH OF IMPLIED WARRANTIES
## (13 PA. CONS. STAT. ANN. §§ 2314-2315)
## (BROUGHT ON BEHALF OF THE "PENNSYLVANIA CLASS")

641.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

642.   GM is and was at all relevant times a "merchant" with respect to the GM Vehicles under 13 PA. CONS. STAT. ANN. § 2104, and a "seller" of the GM Vehicles under 13 PA. CONS. STAT. ANN. § 2103(a).

643.   The GM Vehicles are and were at all relevant times "goods" within the meaning of 13 PA. CONS. STAT. ANN. § 2105(a).

644.   A warranty that the GM Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to 13 PA. CONS. STAT. ANN. § 2314.

645.   In addition, a warranty that the GM Vehicles were fit for their particular purpose is implied by law pursuant to 13 PA. CONS. STAT. ANN. § 2315. GM knew at the time of sale of the GM Vehicles that the Pennsylvania State Class intended to use the vehicles in a manner requiring a particular standard of

performance and durability, and that the Pennsylvania State Class was relying on GM's skill and judgment to furnish suitable products for this particular purpose.

646.   The GM Vehicles, when sold and at all times thereafter, were not in merchantable condition, not fit for their ordinary purpose, and were not fit for their particular purpose as a result of their inherent defects, as detailed above. In addition, because any warranty repairs or replacements offered by GM cannot cure the defect in the GM Vehicles, they fail to cure GM's breach of implied warranties.

647.   As a direct and proximate result of GM's breach of its implied warranties, the Pennsylvania State Class members have been damaged in an amount to be determined at trial.

648.   GM was provided notice of the issues raised in this Count and this Complaint as detailed above.

**U.    Claims Brought on Behalf of the Tennessee Subclass**

**COUNT XLVII**

**VIOLATION OF TENNESSEE CONSUMER PROTECTION ACT**
**(TENN. CODE ANN. § 47-18-101, ET SEQ.)**
**(BROUGHT ON BEHALF OF THE "TENNESSEE CLASS")**

649.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

650.   GM and the Tennessee State Class are "persons" within the meaning of TENN. CODE ANN. § 47-18-103 (2), and the Tennessee State Class are

"consumers" within the meaning of TENN. CODE ANN. § 47-18-103 (2). The Tennessee State Class were "natural persons" within the meaning of TENN. CODE ANN. § 47-18-103 (2).

651.   GM's conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of TENN. CODE ANN. § 47-18-103 (19).  The GM Vehicles were at all relevant times "goods" within the meaning of TENN. CODE ANN. § 47-18-103 (7).

652.   The Tennessee Consumer Protection Act ("Tennessee CPA") makes unlawful "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce" under Tenn. Code Ann. § 47-18-104. Without limitation, this includes:

> (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not have;

> (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

> (9) advertising goods or services with intent not to sell them as advertised.

TENN. CODE ANN. § 47-18-104.

653.    In the course of its business, GM violated the Tennessee CPA by knowingly misrepresenting and intentionally concealing material facts regarding the durability, reliability, safety, and performance of the GM Vehicles, as detailed above.    Specifically, in marketing, offering for sale, and selling the defective GM Vehicles, GM engaged in one or more of the following unfair or deceptive acts or practices within the meaning of TENN. CODE ANN. § 47-18-101, et seq. by:

    a.    Representing that the GM Vehicles have characteristics, benefits, or qualities that they do not have;

    b.    Representing that the GM Vehicles are of a particular standard and quality when they are not; and/or

    c.    Advertising the GM Vehicles with the intent not to sell them as advertised.

654.    GM's scheme and concealment of the true characteristics of the GM Vehicles were material to the Tennessee State Class, and GM misrepresented, concealed, or failed to disclose the truth with the intention that the Tennessee State Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, the Tennessee State Class would not have purchased the GM Vehicles, or would have paid significantly less for them.

655.   The Tennessee State Class members had no way of discerning that GM's representations were false and misleading, or otherwise learning the facts that GM had concealed or failed to disclose.

656.   GM had an ongoing duty to the Tennessee State Class to refrain from unfair and deceptive practices under the Tennessee CPA In the course of its business.   Specifically, GM owed the Tennessee State Class members a duty to disclose all the material facts concerning the GM Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the Tennessee State Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

657.   The Tennessee State Class members suffered ascertainable loss and actual damages as a direct and proximate result of GM's concealment, misrepresentations, and/or failure to disclose material information.

658.   Pursuant to TENN. CODE ANN. § 47-18-109 (a), the Tennessee State Class seeks an order awarding damages, treble damages, and any other just and proper relief available under the Tennessee CPA.

## COUNT XLVIII

### BREACH OF IMPLIED WARRANTIES
### TENN. CODE ANN. §§ 47-2-314 AND 47-2-315
### (BROUGHT ON BEHALF OF THE "TENNESSEE CLASS")

659.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

660.   GM is and was at all relevant times a "seller" with respect to the GM Vehicles under TENN. CODE ANN. § 47-2-103(a)(d). The Tennessee State Class are and were at all relevant times "buyers" with respect to the GM Vehicles under TENN. CODE ANN. § 47-2-313 (1). The GM Vehicles are and were at all relevant times "goods" within the meaning of TENN. CODE ANN. § 47-2-313 (1) and (2). At all relevant times, GM also was and is a "merchant" within the meaning of TENN. CODE ANN. § 47-2-104(1).

661.   A warranty that the GM Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to TENN. CODE ANN. § 47-2-314.

662.   In addition, a warranty that the GM Vehicles were fit for their particular purpose is implied by law pursuant to TENN. CODE ANN. § 47-2-315. GM knew at the time of sale of the GM Vehicles that the Tennessee State Class intended to use the vehicles in a manner requiring a particular standard of

performance and durability, and that the Tennessee State Class was relying on GM's skill and judgment to furnish suitable products for this particular purpose.

663.   GM knew at the time of sale of the GM Vehicles that the Tennessee State Class intended to use the vehicles in a manner requiring a particular standard of performance and durability, and that the Tennessee State Class was relying on GM's skill and judgment to furnish suitable products for this particular purpose.

664.   The GM Vehicles, when sold and at all times thereafter, were not in merchantable condition, not fit for their ordinary purpose, and were not fit for their particular purpose as a result of their inherent defects, as detailed above. In addition, because any warranty repairs or replacements offered by GM cannot cure the defect in the GM Vehicles, they fail to cure GM's breach of implied warranties.

665.   As a direct and proximate result of GM's breach of its implied warranties, the Tennessee State Class members have been damaged in an amount to be determined at trial.

666.   GM was provided notice of the issues raised in this Count and this Complaint as detailed above.

- 205

## V.     Claims Brought on Behalf of the Texas Subclass

## COUNT XLIX

## VIOLATIONS OF THE TEXAS DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT
## (TEX. BUS. & COM. CODE § 17.41, ET SEQ.)
## (BROUGHT ON BEHALF OF THE "TEXAS CLASS")

667.    Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

668.    GM and the Texas State Class are "persons" within the meaning of TEX. BUS. & COM. CODE § 17.45, and the Texas State Class are "consumers" within the meaning of TEX. BUS. & COM. CODE § 17.45. The GM Vehicles are and were at all relevant times "goods" within the meaning of TEX. BUS. & COM. CODE § 17.45.

669.    The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") makes unlawful "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce" under TEX. BUS. & COM. CODE § 17.46.  Without limitation, this includes:

> (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not;

(7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

(24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed;

TEX. BUS. & COM. CODE § 17.46.  It also provides a right of action for "breach of an express or implied warranty" and "an unconscionable action or course of action by any person." TEX. BUS. & COM. CODE § 17.50(a)(2) & (3).

670.  In the course of its business, GM violated the Texas DTPA by knowingly misrepresenting and intentionally concealing material facts regarding the durability, reliability, safety, and performance of the GM Vehicles, as detailed above.  Specifically, in marketing, offering for sale, and selling the defective GM Vehicles, GM engaged in one or more of the following unfair or deceptive acts or practices within the meaning of TEX. BUS. & COM. CODE § 17.41, et seq. by:

a. Representing that the GM Vehicles have characteristics or benefits that they do not have;

b. Representing that the GM Vehicles are of a particular standard and quality when they are not; and/or

c. Advertising the GM Vehicles with the intent not to sell them as advertised.

671. GM's scheme and concealment of the true characteristics of the GM Vehicles were material to the Texas State Class, and GM misrepresented, concealed, or failed to disclose the truth with the intention that the Texas State Class would rely on the misrepresentations, concealments, and omissions. Had they known the truth, the Texas State Class would not have purchased the GM Vehicles, or would have paid significantly less for them.

672. The Texas State Class members had no way of discerning that GM's representations were false and misleading, or otherwise learning the facts that GM had concealed or failed to disclose.

673. GM had an ongoing duty to the Texas State Class to refrain from unfair and deceptive practices under the Texas DTPA In the course of its business. Specifically, GM owed the Texas State Class members a duty to disclose all the material facts concerning the GM Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the Texas State Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

- 208

674.   The Texas State Class members suffered ascertainable loss and actual damages as a direct and proximate result of GM's concealment, misrepresentations, and/or failure to disclose material information.

675.   Pursuant to TEX. BUS. & COM. CODE § 17.50 et seq., the Texas State Class seeks an order awarding damages, treble damages, and any other just and proper relief available under the Texas DTPA.

676.   GM was provided notice of the issues raised in this Count and this Complaint, as detailed above. In addition, on December 5, 2017, a notice letter was sent on behalf of the Texas State Class to GM pursuant to TEX. BUS. & COM. CODE § 17.505(a).  Because GM failed to remedy its unlawful conduct within the requisite time period, the Texas State Class seeks all damages and relief to which they are entitled.

## COUNT L

### BREACH OF IMPLIED WARRANTIES
### (TEX. BUS. & COM. CODE §§ 2.314 AND 2.315)
### (BROUGHT ON BEHALF OF THE "TEXAS CLASS")

677.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

678.   GM is and was at all relevant times a "seller" with respect to the GM Vehicles under TEX. BUS. & COM. CODE § 2.103(a)(4). The Texas State Class are and were at all relevant times "buyers" with respect to the GM Vehicles under

TEX. BUS. & COM. CODE § 2.313 (a). The GM Vehicles are and were at all relevant times "goods" within the meaning of TEX. BUS. & COM. CODE § 2.313 (a) and (b).  At all relevant times, GM also was and is a "merchant" within the meaning of TEX. BUS. & COM. CODE § 2.104(a).

679.  A warranty that the GM Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to TEX. BUS. & COM. CODE § 2.314.

680.  In addition, a warranty that the GM Vehicles were fit for their particular purpose is implied by law pursuant to TEX. BUS. & COM. CODE § 2.315. GM knew at the time of sale of the GM Vehicles that the Texas State Class intended to use the vehicles in a manner requiring a particular standard of performance and durability, and that the Texas State Class was relying on GM's skill and judgment to furnish suitable products for this particular purpose.

681.  GM knew at the time of sale of the GM Vehicles that the Texas State Class intended to use the vehicles in a manner requiring a particular standard of performance and durability, and that the Texas State Class was relying on GM's skill and judgment to furnish suitable products for this particular purpose.

682.  The GM Vehicles, when sold and at all times thereafter, were not in merchantable condition, not fit for their ordinary purpose, and were not fit for their particular purpose as a result of their inherent defects, as detailed above. In addition,

because any warranty repairs or replacements offered by GM cannot cure the defect in the GM Vehicles, they fail to cure GM's breach of implied warranties.

683.  As a direct and proximate result of GM's breach of its implied warranties, the Texas State Class members have been damaged in an amount to be determined at trial.

684.  GM was provided notice of the issues raised in this Count and this Complaint as detailed above.

**W.    Claims Brought on Behalf of the Virginia Subclass**

**COUNT LI**

**VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT
(VA. CODE ANN. § 59.1-196, ET SEQ.)
(BROUGHT ON BEHALF OF THE "VIRGINIA CLASS")**

685.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

686.  GM and the Virginia State Class members are "persons" within the meaning of VA. CODE ANN. § 59.1-198. GM is and was at all relevant times a "supplier" under VA. CODE ANN. § 59.1-198.

687.  The sale of the GM Vehicles is and was at all relevant times a "consumer transaction" within the meaning of VA. CODE ANN. § 59.1-198.

688.   The Virginia Consumer Protection Act ("Virginia CPA") prohibits certain "fraudulent acts or practices committed by a supplier in connection with a consumer transaction…" and lists prohibited practices which include:

(5) Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits;

(6) Misrepresenting that goods or services are of a particular standard, quality, grade, style or model;

(8) Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised;

(14) Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

VA. CODE ANN. § 59.1-198.

689.   In the course of its business, GM violated the Virginia CPA by knowingly misrepresenting and intentionally concealing material facts regarding the durability, reliability, safety, and performance of the GM Vehicles, as detailed above.  Specifically, in marketing, offering for sale, and selling the defective GM Vehicles, GM engaged in one or more of the following unfair or deceptive acts or practices within the meaning of VA. CODE ANN. § 59.1-198 et seq. by:

- 212

a.  Representing that the GM Vehicles have characteristics or benefits that they do not have;

b.  Representing that the GM Vehicles are of a particular standard and quality when they are not; and/or

c.  Advertising the GM Vehicles with the intent not to sell them as advertised.

690.  GM's scheme and concealment of the true characteristics of the GM Vehicles were material to the Virginia State Class, and GM misrepresented, concealed, or failed to disclose the truth with the intention that the Virginia State Class would rely on the misrepresentations, concealments, and omissions.  Had they known the truth, the Virginia State Class would not have purchased the GM Vehicles, or would have paid significantly less for them.

691.  The Virginia State Class members had no way of discerning that GM's representations were false and misleading, or otherwise learning the facts that GM had concealed or failed to disclose.

692.  GM had an ongoing duty to the Virginia State Class to refrain from unfair and deceptive practices under the Virginia CPA In the course of its business. Specifically, GM owed the Virginia State Class members a duty to disclose all the material facts concerning the GM Vehicles because it possessed exclusive knowledge, it intentionally concealed such material facts from the Virginia State

Class, and/or it made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

693.   The Virginia State Class members suffered ascertainable loss and actual damages as a direct and proximate result of GM's concealment, misrepresentations, and/or failure to disclose material information.

694.   Pursuant to VA. CODE ANN. § 59.1-204, the Virginia State Class seeks an order awarding damages, treble damages, and any other just and proper relief available under the Virginia CPA.

## COUNT LII

### BREACH OF IMPLIED WARRANTIES
### (VA. CODE ANN. §§ 8.2-314 AND 8.2-315)
### (BROUGHT ON BEHALF OF THE "VIRGINIA CLASS")

695.   Plaintiffs reallege and incorporate by reference all preceding allegations as though fully set forth herein.

696.   GM is and was at all relevant times a "seller" with respect to the GM Vehicles under VA. CODE ANN. § 8-2-313 (1) and (2). At all relevant times, GM also was and is a "merchant" within the meaning of VA. CODE ANN. § 8-2-104(1). 1643. The Virginia State Class are and were at all relevant times "buyers" with respect to the GM Vehicles under VA. CODE ANN. § 8-2-313 (1).  The GM Vehicles are and were at all relevant times "goods" within the meaning VA. CODE ANN. § 8-2-313 (1) and (2).

697.   A warranty that the GM Vehicles were in merchantable condition and fit for their ordinary purpose is implied by law pursuant to VA. CODE ANN. § 8.2-314.

698.   In addition, a warranty that the GM Vehicles were fit for their particular purpose is implied by law pursuant to VA. CODE ANN. § 8.2-315. GM knew at the time of sale of the GM Vehicles that the Virginia State Class intended to use the vehicles in a manner requiring a particular standard of performance and durability, and that the Virginia State Class was relying on GM's skill and judgment to furnish suitable products for this particular purpose.

699.   The GM Vehicles, when sold and at all times thereafter, were not in merchantable condition, not fit for their ordinary purpose, and were not fit for their particular purpose as a result of their inherent defects, as detailed above.   In addition, because any warranty repairs or replacements offered by GM cannot cure the defect in the GM Vehicles, they fail to cure GM's breach of implied warranties.

700.   As a direct and proximate result of GM's breach of its implied warranties, the Virginia State Class members have been damaged in an amount to be determined at trial.

701.   GM was provided notice of the issues raised in this Count and this Complaint as detailed above.

## IX.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the members of the Nationwide and State Classes, respectfully request that the Court certify the proposed Nationwide and State Classes, including designating the named Plaintiffs as representatives of the Nationwide Class and their respective State Classes and appointing the undersigned as Class Counsel, and the designation of any appropriate issue classes, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in their favor and against Defendant including the following relief:

A.     A declaration that any applicable statutes of limitations are tolled due to Defendant's fraudulent concealment and that the Defendant is estopped from relying on any statutes of limitations in defense;

B.     Restitution, compensatory damages, and costs for economic loss and out-of- pocket costs;

C.     Punitive and exemplary damages under applicable law;

D.     Reimbursement and compensation of the full purchase price for any replacement dashboard purchased by a Plaintiff or Class Member.

E.     A determination that Defendant is financially responsible for all Class notices and the administration of class relief;

F.     Any applicable statutory or civil penalties;

G.     An order requiring Defendant to pay both pre-judgment and post-judgment interest on any amounts awarded;

H.     An award of reasonable counsel fees, plus reimbursement of reasonable costs, expenses, and disbursements, including reasonable allowances for the fees of experts

I.     Leave to amend this Consolidated Amended Complaint to conform to the evidence produced in discovery and at trial; and

J.     Any such other and further relief the Court deems just and equitable.

## X.     DEMAND FOR JURY TRIAL

Plaintiffs and the Classes hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated: December 22, 2017

By  */s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
**THE MILLER LAW FIRM, PC**
950 W. University Dr., Suite 300
Rochester, Michigan  48307
Tel: (248) 841-2200
Fax: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

James E. Cecchi
Caroline F. Bartlett
**CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel: (973) 994-1700
Fax: (973) 994-1744
jcecchi@carellabyrne.com
cbartlett@carellabyrne.com

Christopher A. Seeger
David R. Buchanan
Christopher L. Ayers
**SEEGER WEISS LLP**
77 Water Street, 26th Floor
New York, NY 10005
Tel.: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com
dbuchanan@seegerweiss.com
cayers@seegerweiss.com

Paul J. Geller
Mark J. Dearman
Jason H. Alperstein
Ricardo J. Marenco
**ROBBINS GELLER RUDMAN
        & DOWD LLP**
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
mdearman@rgrdlaw.com
jalperstein@rgrdlaw.com
rmarenco@rgrdlaw.com

Joseph H. Meltzer
**KESSLER TOPAZ MELTZER &
CHECK, LLP**
280 King of Prussia Road
Radnor, PA 19087
Tel: (610) 667-7706
Fax: (610) 667-7056
jmeltzerk@ktmc.com

*Attorneys for Plaintiffs and the Proposed
Classes*